FILED
United States Court of Appeals
Tenth Circuit

November 6, 2015

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff-Appellee/
Cross-Appellant,

v.

MICHAEL STEVEN MORGAN,

      Defendant-Appellant/
Cross-Appellee.

Nos. 13-6025 and 13-6052
(D.C. No. 5:11-CR-00108-C-1)
(W.D. Okla.)

**ORDER AND JUDGMENT**[*]

Before **HARTZ**, **O'BRIEN**, and **HOLMES**, Circuit Judges.

Michael Steven Morgan, an attorney and politician, appeals from a bribery

conviction. *See* 18 U.S.C. § 666. As he would have it, the evidence was insufficient to

convict and the jury was not properly instructed on specific intent. Not only that, but he

should have a new trial because the government failed to disclose tacit agreements with a

---

[*] This order and judgment is an unpublished decision, not binding precedent. 10th
Cir. R. 32.1(A). Citation to unpublished decisions is not prohibited. Fed. R. App. 32.1.
It is appropriate as it relates to law of the case, issue preclusion and claim preclusion.
Unpublished decisions may also be cited for their persuasive value. 10th Cir. R. 32.1(A).
Citation to an order and judgment must be accompanied by an appropriate parenthetical
notation – (unpublished). *Id.*

witness.  The government's cross-appeal claims Morgan's sentence (no incarceration; only probation) is substantively unreasonable given the nature of his crime.  We affirm the conviction but reverse and remand for resentencing.

## I. Trial Evidence

Morgan, a practicing attorney, was elected to the Oklahoma State Senate in 1996 and remained a senator until he was term-limited in 2008.[1]  *See* Okla. Const., art. V, § 17A (establishing a twelve-year term limit for state legislators).  He served as the chairman of the appropriations committee in 2004 and became President Pro Tempore (Pro Tem)[2] of the Senate in March 2005.[3]  The bribery occurred while he occupied that august position.

In 2005 and 2006, members of the Oklahoma Assisted Living Association ("OKALA") became unhappy with the Oklahoma Department of Health's (ODH)

---

[1] Oklahoma has a "citizen legislature," meaning the vast majority of its members have a full-time occupation in addition to serving in the legislature.  (Morgan's App'x, Vol. 5 at 2036.)  In contrast, members of the United States Congress are prohibited from having outside employment.

[2] The Pro-Tem was described at trial as the "chief operating officer or CEO" of the Senate.  (Morgan's App'x, Vol. 5 at 2038.)  The position is responsible for, among other things, setting the agenda, running the caucus meetings, and appointing members of the Senate to the various Senate committees.  In one former Senator's view, the Pro Tem is

> the most powerful man in the State Capitol . . . .  He hires and fires staff on the Senate, he appoints [members of the Senate to] the [various] committees.  And in the State of Oklahoma, with a weak governor form of government, the governor can't do anything without the advice and consent of the Senate.

(*Id.*, Vol. 4 at 1356-57.)

[3] During the 2007 and 2008 legislative sessions, Morgan was Co-President Pro Tem because the Senate was equally divided between the two political parties.

enforcement activities. It was removing residents from assisted living facilities to nursing homes because the assisted living facilities were unable to provide the necessary level of care. Sam Crosby, part owner of OKALA member Silver Oak Senior Living, was extremely vocal regarding his objections to the ODH's efforts. He claimed Silver Oak was targeted by the ODH and repeatedly had to deal with what he perceived as unfair civil fines. He hired several law firms and lawyers to assist with these disputes. A lawyer in one of the firms specialized in dealing with the ODH.

In May 2006, Crosby hired lobbyist Benny Vanatta to promote Silver Oak's position with the legislature. Vanatta immediately arranged a meeting with Crosby and Morgan in Morgan's office at the Capitol. According to Crosby's testimony, they met for "about an hour to an hour and a half." (Morgan's App'x, Vol. 5 at 1904.) His testimony continued as follows. I told "them all my troubles and the fights with the [ODH] and everything and that I needed some help. I didn't care whether it was a phone call, legislation, meetings, whatever, I just needed some help to get them off my back." (*Id.*) About forty-five minutes into the meeting, Vanatta left to get coffee. While Vanatta was gone, Morgan told Crosby, "This is the way it works. You pay me a $1,000 a month retainer." (*Id.*) Morgan assured Crosby the arrangement was legal. Crosby asked, "Well, do I maybe get some traffic tickets or something for that [amount]?"[4] (*Id.*) Morgan told Crosby to call his law firm and it will "help you with [the traffic tickets]."

---

[4] In 2006, Crosby owned twelve assisted living facilities in Nebraska, Oklahoma, Texas, and Wyoming employing about 600 persons. Those employees received "a lot of traffic tickets." (Morgan's App'x, Vol. 5 at 1900.)

(*Id.*) In the end, even though it "[d]idn't sound right" to Crosby, Silver Oak made twelve $1,000 payments to Morgan from July 2006 until July 2007.[5] (*Id.*)

Shortly after that meeting, Dorya Huser, chief of the ODH's long-term care division, was contacted by her supervisor, Rocky McElvany. McElvany told Huser they "had a request from a legislator to come talk about the rules." (Morgan's App'x, Vol. 5 at 1949.) As a result, Vanatta, Crosby, and his partner Eric Lindsey met with Huser and McElvany in Morgan's conference room at the Capitol (Morgan was present, according to Crosby's testimony. Morgan said he did not attend the meeting but did stop in for a moment to say hello to the participants). The meeting did not go well. Huser testified to the encounter being "extremely contentious." (*Id.* at 1950.) A few weeks later, on June 15, 2006, Crosby e-mailed a letter to numerous House and Senate members complaining about the ODH proposing regulations "that would limit the [living] choice[s] of seniors" and improperly interpreting existing regulations to the detriment of seniors. (*Id.*, Vol. 7 at 2638.) He accused the ODH of having "a hidden agenda to destroy the Assisted Living concept and industry." (*Id.*)

That same month, at Crosby's direction, Belinda Arguello, Silver Oak's director of compliance, began sending e-mails to Morgan[6] reporting Silver Oak's ongoing

---

[5] Morgan did not send billing statements to Silver Oak during 2006 although its payments to Morgan began in July 2006. Morgan began sending statements in January 2007 and continued to do so monthly through July 2007. The statements charged Silver Oak $1,000 per month and simply stated the fee was for "[p]rofessional [s]ervices [r]endered." (Morgan's App'x, Vol. 7 at 2640-46.)

[6] Arguello initially sent the e-mails to Morgan's e-mail address at the Senate.

(Continued . . .)

- 4 -

difficulties with the ODH.  She attached communications between Silver Oak and the ODH.  When Morgan had not substantively responded by August, Crosby suggested an e-mail be sent from his e-mail address to ensure Morgan had received the information. There still was no response.  The only communication between Crosby and Morgan after the meeting in May 2006 was a visit from Morgan to Crosby's office seeking a campaign contribution for another candidate.  Crosby also said he attempted to contact Morgan's law office several times concerning traffic tickets.  His testimony was clear enough: Morgan never assisted Silver Oak as a lawyer in dealing with the ODH or any other matter, but he found another way to be helpful.

In January 2007, Morgan authored and introduced Senate Bill 738 (S.B. 738).  It provided:

> If a resident in an assisted living center is receiving care in addition to the room, board, and personal care specified in the Continuum of Care and Assisted Living Act as determined by a physician, the State Department of Health shall not order the removal of the resident from the assisted living center if the following conditions are met:
>
> 1. The resident, resident's family or legal representative, the resident's physician, and the owner, operator or governing body of the assisted living center consent to the resident's continued stay in the assisted living center; and
>
> 2. The owner, operator, or governing body of the assisted living center commits to assuring that the resident receives necessary additional services.

---

Morgan did e-mail Arguello directing her to send all future correspondence to his law office e-mail address.

(Morgan's App'x, Vol. 7 at 2680-81.) Huser concluded the purpose of Morgan's bill "was to tell the [ODH] to leave assisted living facilities alone and not be writing these level-of-care deficiencies." (*Id.*, Vol. 5 at 1953.) Mary Brinkley, the executive director of an association of aging services providers, testified about her choice not to lobby against the bill in the Senate because Morgan had introduced it—"[I]t's really hard to go up against leadership and to change a bill or to make any amendment to it." (*Id.* at 1879.)

After the bill passed unanimously in the Senate, it was amended in the House to provide more detail.[7] But even in its final version, S.B. 738 favorably addressed many of Crosby's concerns.

The Governor signed S.B. 738 into law on June 4, 2007. Silver Oak's last monthly payment to Morgan was on July 20, 2007. On August 13, Crosby sent Morgan a letter thanking him for his "assistance to our program" and terminating his retainer because Silver Oak had "elected to limit [its] political involvement for a while."[8] (Morgan's App'x, Vol. 7 at 2701.)

---

[7] As explained at trial, Senate Bill 738 was a "shell bill" when introduced. (Morgan's App'x, Vol. 5 at 1838.) This means the bill's language is minimal and expected to be fully developed during the legislative session.

[8] At trial, Morgan denied all of Crosby's testimony and gave his version of the events, testifying as follows: the alleged meeting at Morgan's Senate office in May 2006 never occurred. Instead, he met with Crosby sometime in June (after the meeting between Silver Oak and the ODH) at Crosby's office. Crosby hired him to determine whether Silver Oak could bring a viable lawsuit against the ODH. He reviewed the material attached to Arguello's e-mails and concluded Silver Oak had no basis for a suit and may actually be subject to civil and/or criminal sanctions. Morgan did not leave any written record of his analysis because he was afraid it might be used against his client. He claimed to having arranged a face-to-face meeting with Crosby in September and told
(Continued . . .)

- 6 -

## II. Procedural History

On March 30, 2011, a grand jury indicted Morgan with respect to three clients who paid him monthly retainer fees. Counts 1 through 29 related to fees ($141,664.52) he received from Dilworth Development, a small landfill company in Northern Oklahoma, from April 2006 to May 2008. Count 1 alleged he conspired with attorney N. Martin Stringer and lobbyist William Andrew Skeith to accept the fees in exchange for his legislative influence on behalf of Dilworth. Counts 2 through 29 alleged extortion in violation of 18 U.S.C. § 1951(a) and mail fraud (honest services) in violation of 18 U.S.C. §§ 1341 & 1346.

Counts 30 through 62 had to do with fees ($250,000) Morgan collected between April 2006 and December 2008 from Tenaska, Inc., a Nebraska energy corporation with business interests in Oklahoma. These counts alleged Morgan conspired with Stringer and Skeith to accept the fees in return for legislative influence (Count 30) and engaged in mail fraud (honest services) in violation of 18 U.S.C. §§ 1341 & 1346 (Counts 31-62).

Count 63 charged bribery under 18 U.S.C. § 666(a)(1)(B) based on Morgan's receipt of $12,000 from Silver Oak. Morgan was the only defendant named in the Silver Oak count.

After the government's evidence was complete and it rested, the district court dismissed many of the charges, including Count 30—the conspiracy count relating to

---

Crosby Silver Oak could be in serious trouble. Because Crosby seemed to appreciate his honesty and could need his help in the future, Crosby decided to keep Morgan on retainer.

Tenaska—as to Morgan.[9]  After a trial lasting over two weeks, the jury convicted Morgan of bribery in connection with Silver Oak (Count 63).  It was unable to reach a verdict on Counts 2 through 29—the extortion and mail fraud counts relating to Dilworth.  It acquitted Morgan on Count 1—the conspiracy count relating to Dilworth—and the mail fraud charges relating to Tenaska (Counts 31 through 62).  The court denied Morgan's post-trial motion for judgment of acquittal on Count 63 and his subsequent motion for a new trial.

### III. Morgan's Direct Appeal

*A. Sufficiency of the Evidence*

"Whether the government presented sufficient evidence to support a conviction is a legal question we review *de novo*."  *United States v. Hernandez,* 509 F.3d 1290, 1295 (10th Cir. 2007) (quotations omitted).  We "ask[] only whether, taking the evidence—both direct and circumstantial, together with reasonable inferences to be drawn therefrom—in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt."  *United States v. Baldridge,* 559 F.3d 1126, 1134 (10th Cir. 2009) (quotations omitted).  "We will not reverse a conviction unless no rational trier of fact could have reached the disputed verdict.  The evidence

---

[9] The court granted Skeith's motion for judgment of acquittal on all counts against him (Counts 1 through 62).  It also granted Stringer's similar motion as to Counts 30 through 62 (the Tenaska counts).  Without either of these defendants, and having alleged no other co-conspirators, the government agreed to dismiss Count 30 (conspiracy count relating to Tenaska) against Morgan.  The jury eventually acquitted Stringer of the remaining (Dilworth) counts against him (Counts 1 through 29).

necessary to support a verdict need not conclusively exclude every other reasonable hypothesis and need not negate all possibilities except guilt." *Id*. (quotations omitted).

To establish a violation of 18 U.S.C. 666(a)(1)(B), the government must, of course, prove all elements of the offense beyond a reasonable doubt. *See In re Winship*, 397 U.S. 358, 364 (1970) ("[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."). Among those elements, and critical to this appeal, is that Morgan, while an agent of the State of Oklahoma, "corruptly solicit[ed] or demand[ed] . . . or accept[ed] or agree[d] to accept" Silver Oak's retainer payments while "intending to be influenced or rewarded in connection with any business, transaction, or series of transactions" of the State of Oklahoma. 18 U.S.C. § 666(a)(1)(B). Morgan claims the government's evidence on this element fell short. According to him, a bribery conviction requires proof of a quid pro quo, which, also according to him, requires a corrupt agreement between the payor and payee. In other words, as Morgan would have it, the government is required to show both he and Crosby acted with a corrupt intent. He says there was no evidence establishing Crosby's corrupt intent—Crosby never testified to having intended to bribe Morgan and his testimony about needing "help" during their initial meeting is not enough for a jury to infer intent. (Morgan's App'x, Vol. 5 at 1905.)

He also claims the following evidence indicates Crosby's intent was not to obtain his help in the legislature but rather to retain him for legitimate legal services: (1) Arguello's e-mails to him, (2) Crosby's request for help with traffic tickets, (3) Crosby's

knowledge of Morgan's past successful litigation against state agencies,[10] and (4) Crosby's admitted lack of knowledge of S.B. 738 until the government handed him a copy of the bill when it recruited his testimony.[11]

In support of his argument that both parties must have a corrupt intent, Morgan relies primarily on *United States v. Dean*, 629 F.3d 257 (D.C. Cir. 2011). Dean was employed by the District of Columbia Department of Consumer and Regulatory Affairs (DCRA). Among other things, she processed "various license applications, for example, licenses needed by establishments for their elevators." *Id*. at 258. Her scheme was to inform applicants the payments for a timely license submission could be made by check but all late fees had to be paid in cash. *Id.* She would then keep the cash payments for her own use. *Id.* After a local hotel employee informed the Federal Bureau of Investigation (FBI) about this activity, the FBI set up a sting operation. *Id.* The hotel employee (acting on instruction from the FBI) approached Dean seeking additional licenses. Consistent with her general scheme, Dean informed the employee that the

---

[10] Trial testimony established that Morgan could, as a legislator-lawyer, sue state agencies, but he could not represent clients before the agencies.

[11] Morgan did not raise the "bribery requires both the payor and payee to have a corrupt intent" argument in his motion for judgment of acquittal. Our review, therefore, would normally be for plain error. *United States v. DeChristopher*, 695 F.3d 1082, 1091 (10th Cir. 2012). However, we need not decide whether he meets the stringent plain error standard because his argument fails under even the more lenient de novo review. *United States v. Cooper*, 654 F.3d 1104, 1118 (10th Cir. 2011). Moreover, "a conviction in the absence of sufficient evidence will almost always satisfy all four plain-error requirements. Thus, our review for plain error in this context differs little from our de novo review of a properly preserved sufficiency claim." *United States v. Gallegos*, 784 F.3d 1356, 1359 (10th Cir. 2015).

timely license fees may be paid by check but late fees of $1,275 could only be paid in cash. *Id.* After the employee gave Dean the $1,275 in cash, Dean was arrested, charged, and subsequently found guilty of soliciting a bribe and extortion. *Id.*

The appellate court reversed her conviction, writing:

> There was no agreement between the parties that the $1275 was for Dean personally. She accepted the money ostensibly on behalf of the DCRA with every indication that the fee was required for the [license]. Furthermore, we see nothing in the record to suggest that the [hotel] expected favorable processing of the license or that Dean agreed to provide favorable processing.

*Id.* at 260. Therefore, the government failed to prove an agreement between Dean and the hotel that she would perform her official duties in return for a personal benefit to the hotel. *Id.* at 259-60.

*Dean*, however, does not require proof of corrupt intent on the part of both parties. As the D.C. Circuit subsequently made clear, the use of the word "agreement" in *Dean* was

> used as a synonym for specific intent. When, as in *Dean*, a public official is charged with *soliciting* a bribe, the evidence must show that the official conveyed an intent to perform official acts in exchange for personal benefit. Accordingly, the element absent in *Dean* [was] an intent to offer or solicit an exchange of official action for personal gain.

*United States v. Ring*, 706 F.3d 460, 468 (D.C. Cir. 2013). Dean's conviction was set aside not because the hotel employee lacked corrupt intent but because Dean did—she accepted or solicited the money ostensibly on behalf of the DCRA but not with an intent to use her position or influence to garner favorable licensing treatment for the hotel. In other words, Dean's crime was theft, not bribery.

The *Ring* case is even more instructive.  Ring, a lobbyist, was convicted of honest-services fraud (by bribery) based on his having provided dinners, drinks, travel, concerts, and sporting events to congressional and executive branch officials.  *Id.* at 464.  Because he was prosecuted for honest services fraud on a bribery theory, the parties agreed the government had to prove the elements of bribery.  *Id.* at 467.  Like Morgan, however, Ring claimed the jury instructions were flawed because they failed to require the jury to find the public officials receiving the favors had agreed to the corrupt exchange.  *Id.* at 466-67.  But there was no error:

> The bribery statute expressly criminalizes a mere "offer" of something of value with the intent to influence an official act.  18 U.S.C. § 201(b)(1).  That the official need not accept that offer for the act of bribery to be complete is evident from the structure of the statute, which defines two separate crimes: the act of offering a bribe and the act of soliciting or accepting a bribe.  *See id.* § 201(b)(1)–(2).  Confirming this interpretation, the Supreme Court held in *United States v. Brewster*, 408 U.S. 501, 92 S. Ct. 2531, 33 L.Ed.2d 507 (1972), that, with respect to a bribe *payee*, the "acceptance of the bribe is the violation of the statute."  *Id.* at 526, 92 S. Ct. 2531.  The parallel proposition in the context of a bribe *payor* is straightforward: the offer of the bribe is the violation of the statute.  Indeed, we have made clear that the quid pro quo need not be "fully executed for the act to be considered a bribe."  *Orenuga*, 430 F.3d at 1166.

> Because bribery does not require the official to agree to or actually complete a corrupt exchange, neither does honest-services fraud by bribery.  Although we need look no further than black-letter bribery law to reach this conclusion, the fact that the wire fraud statute "'punishes the scheme, not its success,'" *Pasquantino v. United States*, 544 U.S. 349, 371, 125 S. Ct. 1766, 161 L.Ed.2d 619 (2005) (quoting *United States v. Pierce*, 224 F.3d 158, 166 (2d Cir. 2000)), lends further support to our conclusion that a defendant may be guilty of honest-services bribery where he offers an official something of value with a specific intent to effect a quid pro quo even if that official emphatically refuses to accept.  In other words, though the offerer of a bribe is guilty of honest-services fraud, his attempted target may be entirely innocent.  *See United States v. Anderson*, 509 F.2d 312, 332 (D.C. Cir. 1974) (bribe payer's culpability may differ from official's culpability).

*Id.* at 467. Although *Ring* addressed 18 U.S.C. § 201, the statute prohibiting bribes and gratuities by federal officials, we see no reason a different result would follow under the statute here, § 666.[12]

Morgan also relies on the Supreme Court's decision in *United States v. Sun-Diamond Growers of Cal.*, 526 U.S. 398 (1999), where, when addressing § 201, the Supreme Court required a "*quid pro quo*—a specific intent to give or receive something of value *in exchange* for an official act." *Id.* at 404-05. Morgan hangs his hat on the "quid pro quo" language but his argument exceeds elastic limits. The Court was not saying bribery requires both parties to a bribe to have corrupt intent. Rather, it was distinguishing between bribery and an illegal gratuity, both penalized, but in different sections of § 201. *Id.* In the end, the Court merely held that to establish a violation of the illegal gratuity statute, "the Government must prove a link between a thing of value conferred upon a public official and a specific 'official act' for or because of which it was given." *Id.* at 414.

The key question in this case, then, is not whether both Morgan <u>and</u> Crosby had a corrupt intent but <u>whether Morgan had a corrupt intent</u>—whether he had the intent to

---

[12] Section 666 is the offspring of 18 U.S.C. § 201. It applies criminal sanctions to bribery by "an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof" where the entity "receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance." 18 U.S.C. § 666(a)(1), (b). As the parties acknowledge, the Oklahoma legislature qualifies as such an entity.

receive the retainer fees from Silver Oak in exchange for his legislative influence.[13]  Not

surprisingly, Morgan says no.  He points to the evidence establishing it is neither illegal

nor unethical for him, as a legislator-lawyer, to have an attorney-client relationship with

Silver Oak or to charge his clients a monthly retainer fee.  He also claims the following

evidence negates an inference of his having acted with a corrupt intent: (1) his regular

arrangements with other clients for fees in the form of a nonrefundable monthly retainer;

(2) his lack of involvement as S.B. 738 proceeded through the Senate and House; and (3)

the bill's application to the industry as a whole, not Silver Oak specifically.  He also says

the lack of any attempt to conceal his arrangement with Crosby—he deposited the fees

into his law office account—belies any corruption.[14]

Morgan's argument is unconvincing.  The retainer agreement between Morgan

and Crosby was made at a meeting at Morgan's office in the Capitol.  The meeting was

---

[13] Although the quid pro quo requirement for bribery requires an intent to give or receive something of value in exchange for an official act, it was not necessary for Morgan to have contemplated S.B. 738 or any other specific act when he solicited the bribe (only that he expected to take some official action in exchange for money).  S*ee United States v. Abbey*, 560 F.3d 513, 520-21 (6th Cir. 2009).  Morgan so conceded at oral argument.

[14] According to Morgan, the government admitted at sentencing there was insufficient evidence supporting his conviction by asking "the Court, in spite of its findings, to consider the fact that any fair evaluation of this evidence leads to the conclusion that Mr. Morgan was, at the very least, right up against the line over and over in his dealings with these supposed clients."  (Government's Supp. App'x, Vol. 3 at 1244.)  Morgan takes this statement completely out of context.  It was made after the court sustained his objection to consideration of the bribes involving clients other than Silver Oak as relevant conduct.  The government's reference to "this evidence," read in its proper context, refers to the evidence the government presented at sentencing concerning the other bribes, not the bribe involving Silver Oak.

brokered by a lobbyist hired to promote Silver Oak's governmental relations. Crosby told Morgan "[he] didn't care whether it was a phone call, legislation, meetings," he just needed "help" in getting the ODH "off [his] back." (Morgan's App'x, Vol. 5 at 1905.) Morgan insisted on a monthly retainer, even though he could not represent Silver Oak before the ODH. *See supra* n.10. Shortly thereafter, Huser learned that "a legislator" requested a meeting between the ODH and Silver Oak representatives to take place at the Capitol. (*Id.* at 1949.) Seven and a half months later, Morgan introduced a bill favorably addressing Silver Oak's problems.

There was no written engagement letter in spite of the monthly "retainer" Morgan insisted upon.[15] Moreover, despite Morgan's claim to be providing legal representation to Silver Oak, Arguello's e-mails went unanswered, Morgan's monthly bill to Silver Oak did not specify the legal services provided, and there was no evidence of any legal services actually performed for Silver Oak (absent Morgan's self-serving claim to have consulted with Crosby about a possible lawsuit against the ODH). Finally, shortly after the bill was signed into law, Crosby informed Morgan that Silver Oak would no longer pay because its principals decided to limit its "*political* involvement." (Morgan's App'x, Vol. 7 at 2701 (emphasis added).)

---

[15] Although such letter is not required by the Oklahoma Rules of Professional Conduct, it is common when retaining the legal services of an attorney and was also common in Morgan's practice with other clients. While not determinative, the absence of an engagement letter may, in context, be part of the totality of the circumstances a jury may consider.

The rules governing Oklahoma's "citizen legislature" allow its members to maintain an outside source of income, something Morgan emphasizes. (Morgan's App'x, Vol. 6 at 2392.) Indeed, he points to trial testimony establishing that a legislator-lawyer may continue to legislate on matters affecting a client's interest, so long as the legislation is applied to an industry on a state-wide basis. But, as he admits, the same line of testimony also established such a practice to be unlawful if the legislator-lawyer is paid to do so. Neither federal law nor Oklahoma rules allow a legislator to accept payment in return for wielding political influence. Moreover, S.B. 738's effect on the industry as a whole (even if beneficial) does not negate corrupt intent. "[A] valid purpose that partially motivates a transaction does not insulate participants in an unlawful transaction from criminal liability." *United States v. Coyne*, 4 F.3d 100, 113 (2d Cir. 1993) (quotations omitted).

Finally, Morgan claims he did not attempt to cover up his facial arrangement with Crosby; he deposited the payments he received from Silver Oak into his law office account and testified that his arrangement with Crosby was for legal services he provided. But those aware of all of the facts, for instance the jurors, could conclude he did so merely to conceal the real purpose behind the payments. And that skepticism could well be justified. Parts of Morgan's story are dubious. He claimed Crosby hired him to determine whether Silver Oak could sue the ODH. But Crosby's legal armada included an attorney who specialized in dealing with the ODH. And Morgan had no written record of his communications with Crosby. He claims the lack of a written record was for

- 16 -

Crosby's protection, but the attorney-client privilege would most likely have adequately met that purpose.

Perhaps the hallmark of our jury system is the jury's role in resolving uncertainty. It, alone, is left to find the facts. And the fruits of its effort lie in the verdict. The jury could have believed Morgan's version of events but did not.[16] *See United States v. Oliver*, 278 F.3d 1035, 1043 (10th Cir. 2001) ("It is left to the jury to weigh conflicting evidence and to consider the credibility of witnesses.") (quotations omitted). Instead, this jury determined Morgan demanded retainer fees with the intent to "help" Crosby through his position as an influential legislator. Its decision is rationally supported by the evidence.[17]

---

[16] As the court aptly explained in denying Morgan's motion for acquittal based on the sufficiency of the evidence:

> [I]t is clear that Morgan's motion must be denied. Each instance on which Morgan relies to dispute the validity of the jury's verdict functions in that way only if the Court views his interpretation of the evidence in a manner favorable only to Morgan. For example, when arguing the import of his initial conversation with Crosby, Morgan offers a plausible explanation for the conversation between the two men. However, Morgan's explanation is not the only one, and in fact the jury's verdict clearly rejects that explanation in favor of the reasoning offered by Plaintiff at trial. As Plaintiff's brief makes clear, there was evidence offered at trial which would establish each element of the crime of conviction. That Morgan can now offer an innocent explanation for that evidence does not entitle him to acquittal.

(Morgan's App'x, Vol. 1 at 273.)

[17] In his reply brief, Morgan suggests the jury convicted him on Count 63, despite his claim of insufficient evidence, because it was confused and improperly influenced by the evidence presented of the dismissed counts and the evidence concerning his co-defendants, including co-conspirator hearsay. But the jury's mixed verdict (conviction on one count, acquittal on others, no verdict as to others, and acquittal of co-defendant

(Continued . . .)

*B. Jury Instruction on Specific Intent*

Morgan quarrels with the way the jury was instructed on the specific intent required for conviction. But he did not object to the instruction given, limiting our review to plain error. *United States v. Davis*, 750 F.3d 1186, 1191 (10th Cir. 2014). "Under Federal Rule of Criminal Procedure 52(b), an appellate court may, in its discretion, correct an error not raised at trial only where the appellant demonstrates that (1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings; and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id.* (quotations omitted).

The relevant portion of the instruction governing the bribery charge required the jury to find beyond a reasonable doubt:

> That the defendant solicited, demanded, accepted, or agreed to accept anything of value from another person; [and]

> That *the defendant did so* corruptly, that is, *with the intent to be influenced* in connection with some business, transaction, or series of transactions of the State of Oklahoma.

---

Stringer) suggests just the opposite; it properly distinguished between the counts and defendants. To the extent Morgan is seeking review of the court's denial of his motion for a severance of counts and defendants or its admission of co-conspirator hearsay, he is simply too late. *See M.D. Mark, Inc. v. Kerr–McGee Corp.*, 565 F.3d 753, 768 n.7 (10th Cir. 2009) ("[T]he general rule in this circuit is that a party waives issues and arguments raised for the first time in a reply brief.").

(Morgan's App'x, Vol. 1 at 179 (emphasis added).)  The instruction further stated: "A person acts corruptly when *that person acts with the understanding that something of value is to be offered or given to influence him* in connection with his official duties." (*Id.* at 180 (emphasis added).)  It also provided: "[W]hen payments are accepted by a public official *from a payor with the intent to obtain that official's actions on an 'as needed' basis*, so that when the opportunity presents itself that public official takes official action on the payor's behalf in return for those payments, that constitutes bribery."  (*Id.* at 180-81 (emphasis added).)

In his motion for new trial, Morgan argued the latter two instructions erroneously described the payor's intent not the recipient's and therefore improperly allowed the jury to convict him if it concluded merely that he had knowledge of Crosby's corrupt intent, even absent any corrupt intent on his part.  Stated differently, the jury may have based his conviction on Crosby's corrupt intent, not his own.  The trial court rejected this argument because Morgan's arguments focused on very narrow portions or phrases of the instructions, rather than considering them as a whole.[18]  When properly considered, the

---

[18] We read and evaluate jury instructions in their entirety to "determine whether the instructions, examined in the light of the record as a whole, fairly, adequately, and correctly state the governing law and provide the jury with an ample understanding of the applicable principles of law and factual issues confronting them."  *United States v. Denny*, 939 F.2d 1449, 1454 (10th Cir. 1991).  Generally, "[f]aulty jury instructions require reversal when (1) we have substantial doubt whether the instructions, considered as a whole, properly guided the jury in its deliberations; and (2) when a deficient jury instruction is prejudicial."  *Jones v. United Parcel Serv., Inc.*, 674 F.3d 1187, 1198 (10th Cir. 2012).

instructions fairly and correctly stated the applicable law.  But if the supplemental instructions were erroneous, the court concluded, the error did not "so seriously affect the fairness, integrity, or public reputation of the judicial proceedings that the Court should grant a new trial."  (Morgan's App'x, Vol. 2 at 533.)

Morgan now reiterates the arguments made in the trial court, relying on a Second Circuit decision, *United States v. Ford*, 435 F.3d 204 (2d Cir. 2006).  Ford was an officer of a state employees' union that received federal funds.  *Id.* at 206.  The bribery charge against her alleged she accepted free media services for her reelection campaign and, in return, she steered overpriced union work to the media services provider.  *Id.*  Ford objected to the district court's instruction, which stated in relevant part: "A person acts corruptly when the person acts with the understanding that something of value is to be offered or given to influence her in connection with her organizational duties."  *Id*. at 211 (quotations omitted).  The appellate court reversed Ford's conviction because the instruction "appear[ed] to have told the jury that the 'corruptly' requirement was fully satisfied by [Ford's] knowledge of the donor's intent and omitted any reference to [Ford's] intent in accepting the thing of value . . . ."  *Id*.

Morgan's situation is easily distinguished from Ford's.  Here the court told the jury it could not convict unless it found, beyond a reasonable doubt, that *Morgan* demanded or accepted his retainer fees "*with the intent to be influenced* in connection

- 20 -

with some business, transaction, or series of transactions of the State of Oklahoma."[19] (Morgan's App'x, Vol. 1 at 179 (emphasis added).) Although the supplementary language, standing alone, may have been ill-advised in this case, the instructions as a whole could not have misled or confused the jury regarding the government's burden of proof. *See United States v. Smith*, 13 F.3d 1421, 1424 (10th Cir. 1994) ("Only where the reviewing court has substantial doubt that the jury was fairly guided will the judgment be disturbed.") (quotations omitted). There was no error.

*C. Tacit Agreements*

Prior to Morgan's trial, Crosby was arrested and charged with bank fraud. The bank fraud scheme involved Crosby submitting invoices to a bank which falsely alleged that he had purchased cattle. The invoices allowed Crosby to draw on the line of credit he had with the bank. He also sold the cattle he had used to secure the line of credit without notifying the bank and kept the proceeds. Pursuant to a plea agreement, he pled guilty to one count of making a false statement to a bank. The government disclosed the investigation documents, the charge, and the subsequent plea agreement to the defense.

---

[19] The jury instructions in *Ford* did describe "intending to be influenced" as Ford's intent. 435 F.3d at 212. However, the Second Circuit found these instructions lacking because, among other things, they allowed the jury to find such intent simply if Ford was aware of the payee's intent to give something of value for the purposes of influencing her. *Id.* at 213. The court held that while this awareness "might well constitute strong circumstantial evidence" of the requisite intent, it alone was not enough. *Id.* Here, in contrast, the jury was specifically told it had to find Morgan "solicited, demanded, accepted, or agreed to accept anything of value from another person" and he did so "with the intent to be influenced in connection with some business, transaction, or series of transactions of the State of Oklahoma." (Morgan's App'x, Vol. 1 at 179.)

- 21 -

The disclosure revealed the participation of Crosby's daughter who accepted some cattle from him and then gave her father the proceeds after she sold them in her own name. The disclosure also included allegations, in the form of an affidavit from one of the victims, that Crosby fraudulently sold securities in the form of "Preferred Membership Interests" (PMIs) in 2005.[20] (Morgan's App'x, Vol. 1 at 340.) During jury selection, the defense requested Crosby's presentence report (PSR), which the government supplied (with the court's permission). The report included information about Crosby's bank fraud scheme, his daughter's involvement, and the loans he received from various individuals in the form of PMIs.[21] Despite these disclosures, Morgan sought an

---

[20] After trial, the defense learned that in 2011 another victim of Crosby's PMI scheme had contacted a Colorado lawyer who in turn contacted the U.S. Securities and Exchange Commission (SEC). The SEC transferred the matter to the Oklahoma Department of Securities, which brought an action to enjoin Crosby from offering and selling unregistered securities in Oklahoma. Two months after the verdict against Morgan, Crosby stipulated and consented to the injunctive relief requested.

[21] Morgan complains the information contained in Crosby's PSR concerning the PMI scheme was simply that Crosby had incorrectly listed the money he received from the scheme as equity when he obtained his line of credit from the bank. He contends this information gave him no basis to investigate the PMI scheme further. But the report did outline the scheme:

> Agents also received information from the defendant's previous accountant that [Crosby] was receiving loans from various individuals in the form of Preferred Member Interest (PMIs) in his numerous business interests and that the defendant guaranteed investors 10% on their investments. The accountant believed these investments began in 2003 or 2004 and estimated [Crosby] received approximately $3,000,000 from investors.

(Morgan's App'x, Vol. 8 at 4.) This information, in conjunction with the previous disclosure from one of the victims, was sufficient notice of the need to investigate.

Morgan also complains he did not receive the PSR until jury selection, giving him insufficient time to investigate or verify what was said in the report. But, prior to jury

(Continued . . .)

- 22 -

evidentiary hearing and, in a motion for a new trial, claimed the government failed to disclose tacit agreements it made with Crosby in violation of *Brady v. Maryland,* 373 U.S. 83 (1963), and knowingly presented false evidence in violation of *Napue v. Illinois,* 360 U.S. 264 (1959).

The court denied Morgan's requests. It determined the government timely provided all relevant material. Further, it concluded any undisclosed agreements, if they existed, were immaterial because defense counsel fully addressed Crosby's credibility at trial and additional information would not change the result.

Morgan repeats his trial court arguments here. He claims the government knew Crosby was subject to significant additional criminal charges, including bribery (this case), securities fraud, money laundering, and mail fraud. Further, it knew Crosby's daughter was involved in the bank fraud scheme. In addition, Morgan contends Crosby lied about his assets, employment, and income in his presentence investigation interview. According to Morgan, the government's failure to prosecute either Crosby or his daughter for any of this conduct should inescapably lead one to conclude the government agreed to much more than was stated in Crosby's plea agreement. He further claims the government's failure to seek forfeiture of the assets Crosby received from his criminal activities demonstrates an undisclosed tacit agreement not to do so.

---

selection, Morgan did have the affidavit from one of the victims of the PMI scheme. Moreover, jury selection occurred on February 13, 2012; Crosby was not cross-examined until February 24. In any event, Morgan never requested a continuance.

Finally, Morgan maintains the government allowed false testimony to go uncorrected at trial. Crosby's plea agreement stated it protected him only from prosecution for false statements to the bank from January 2003 through June 2008 (bank fraud) and "does not provide any protection against prosecution for any crime not specifically described above." (Morgan's App'x, Vol. 7 at 2729.) The agreement further provided: "[T]his document contains the only terms of the agreement concerning [Crosby's] plea of guilty in this case and that there are no other deals, bargains, agreements, or understandings that modify or alter these terms." (*Id*. at 2730.) Morgan argues these assertions were false because there were other deals the government was well aware of and it failed to correct the contrary false statements to the jury.[22] Morgan also faults the government for not fully explaining the agreement's statement: "It is the expectation of the United States that its criminal investigation of the defendant's conduct (as opposed to the wrongdoings of others) will cease upon the signing of this plea agreement."[23] (*Id.* at 2723.)

---

[22] Morgan also complains that when his counsel attempted to point out to the jury that Crosby had not been charged with bribery, the court sustained the government's objection. But the question posed was improper because it indicated the punishment for bribery was fifteen years. *See Chapman v. United States*, 443 F.2d 917, 920 (10th Cir. 1971) (no error in prohibiting jury from being informed of the mandatory minimum sentence); *see also United States v. Peña*, 930 F.2d 1486, 1491-92 (10th Cir. 1991) ("Unless a specific statute permits the jury to play a part in meting out punishment, the jury's sole role in a criminal case is to determine whether a defendant is guilty of the crime charged."). Defense counsel elected not to re-phrase the question.

[23] Morgan says the government rewarded Crosby for his testimony with a sentence of five years of probation. Actually Crosby was sentenced to "zero months" imprisonment, which was the result of a downward variance from the advisory guideline

(Continued . . .)

But, except for his claim about Crosby's lies during his presentence interview, Morgan knew prior to trial (from the government's disclosures) about the underlying facts he now suggests prove tacit agreements. He could have cross-examined Crosby on these issues but did not. He chose instead to focus on Crosby's need to cooperate in this case in order to avoid a harsh sentence in his bank fraud case. While he may have had a tactical reason for not inquiring further, Morgan, in fact, had the information and could have used it rather than lying behind the log in order to create issues for appeal. In any event, he has failed to establish that either a *Brady* or *Napue* violation occurred.

*Brady* "established the principle that criminal convictions obtained by . . . suppression of exculpatory or impeaching evidence violates the due process guarantees of the Fourteenth Amendment." *Douglas v. Workman*, 560 F.3d 1156, 1172 (10th Cir. 2009). "The government's obligation to disclose exculpatory [or impeaching] evidence does not turn on an accused's request" and "the duty to disclose such information continues throughout the judicial process." *Id*. at 1172-73.

---

range of 41 to 51 months imprisonment. (Government's Supp. App'x, Vol. 2 at 980.) While the government did seek a departure for Crosby's cooperation, it still recommended Crosby be sentenced to a year and a day. It appears the sentencing judge (a different judge than the judge in this case) varied downward based on Crosby's cooperation as well as his significant health issues. In any event, we will not automatically "infer a preexisting deal subject to disclosure under *Brady*" merely because the government chooses to treat a witness favorably following a trial. *Bell v. Bell,* 512 F.3d 223, 234 (6th Cir. 2008) (en banc); *see also Shabazz v. Artuz,* 336 F.3d 154, 165 (2d Cir. 2003) (post-trial favorable treatment of a witness, standing alone, is insufficient to establish that the prosecution promised leniency to the witness prior to trial).

"*Brady* requires disclosure of tacit agreements between the prosecutor and a witness. A deal is a deal—explicit or tacit. There is no logic that supports distinguishing between the two." *Douglas*, 560 F.3d at 1186; *see also Bell v. Bell,* 512 F.3d 223, 233 (6th Cir. 2008) (en banc). "A conviction based on testimony implicating concealed incentives to an important witness is potentially tainted." *Cargle v. Mullin*, 317 F.3d 1196, 1216 (10th Cir. 2003). "[P]articularized impeachment through possible biases, prejudices, or ulterior motives arising in connection with as-yet uninitiated or uncompleted criminal prosecution" may be important because it suggests "*why* the witness might by lying." *Id*. at 1215 & n.18 (quotations omitted). "And such impeachment increases in sensitivity in direct proportion to the witness's importance to the state's case." *Id*. at 1215 (quotations omitted).

Under *Napue*, "criminal convictions obtained by presentation of known false evidence" also violate due process. *Douglas*, 560 F.3d at 1172; *see also Giglio v. United States,* 405 U.S. 150, 153 (1972) ("[D]eliberate deception of a court and jurors by the presentation of known false evidence is incompatible with rudimentary demands of justice.") (quotations omitted). "The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Douglas*, 560 F.3d at 1172 (quoting *Napue,* 360 U.S. at 269).

Crosby was the key witness for the government as to Count 63. But Morgan merely speculates about undisclosed tacit agreements prior to his trial. He points to no solid evidence of any such agreement. The government's failure to prosecute either Crosby or his daughter or to seek civil forfeiture of his assets is simply not enough. *See*

*Jefferson v. United States*, 730 F.3d 537, 552 (6th Cir. 2013) ("[T]he fact that both [witnesses] were not prosecuted for particular crimes, without more, is insufficient . . . to establish that an undisclosed deal existed.").

The cases relied on by Morgan illustrate this point. Each case involved evidence demonstrating an undisclosed agreement was reached between the government and a witness prior to trial. For example, in *Cargle*, the witness to a murder was promised immunity in exchange for his testimony. 317 F.3d at 1214. However, a few years before the trial, the witness had been given a deferred sentence on an assault charge. *Id.* His current involvement in the murder would have "expos[ed] him to an immediate sentence of up to twenty years' imprisonment on the pre-existing assault conviction." *Id.* "When [later] asked by an investigator . . . whether non-acceleration of the deferred sentence had been a (tacit) part of his agreement to testify in petitioner's case, [the witness] *admitted that he had received an assurance from the district attorney* that nothing would come up in court about the deferred sentence." *Id.* at 1215 (emphasis added). We concluded "there evidently was an additional, and quite significant, quid pro quo for [the witness's] cooperation, which was not recited in the [immunity] agreement and never disclosed to the jury." *Id.* at 1214.

Similarly, in *Douglas*, the witness testified at two murder trials and "provid[ed] the only direct evidence linking [the defendants] to the murder." 560 F.3d at 1174. After the trials, the witness executed a handwritten affidavit recanting his trial testimony and "asserting that he had received the [prosecutor's] assistance in exchange for his testimony, contrary to his denials at both trials." 560 F.3d at 1167. We agreed with the

- 27 -

district court that the prosecutor's failure to disclose his deal with the witness violated *Brady* and the violation was material. *Id.* at 1175; *see also LaCaze v. Warden La. Corr. Inst. for Women*, 645 F.3d 728, 735-36 (5th Cir.) (witness claimed he repeatedly received assurances his son would not be prosecuted prior to implicating defendant), *amended by* 647 F.3d 1175 (5th Cir. 2011); *Harris v. Lafler*, 553 F.3d 1028, 1030-31 (6th Cir. 2009) (witness testified the police promised he and his girlfriend would be released from custody if he implicated defendant); *Graves v. Dretke*, 442 F.3d 334, 340-44 (5th Cir. 2006) (prosecutor informed media five years after trial that star witness had admitted prior to trial that he had acted alone in murders yet prosecutor had failed to reveal this information to defendant; the witness's trial testimony had the defendant involved in the murders).

Unlike *Cargle*, *Douglas,* and the other cases relied upon by Morgan, neither Crosby nor the government has admitted to Crosby having been promised anything other than that to which he testified at trial—hopes for a lenient sentence in his bank fraud case.

Morgan also relies on *United States v. Shaffer*, 789 F.2d 682 (9th Cir. 1986). Shaffer was convicted of drug and income tax violations. 789 F.2d at 684. The court affirmed Shaffer's entitlement to a new trial due to, inter alia, "the government's failure to disclose that [the key trial witness] did in fact have assets which were acquired through drug profiteering (i.e., a house in Palm Springs and funds to enter a health spa)." *Id.* at 689. It said this nondisclosure "coupled with the government's failure to initiate asset forfeiture proceedings to acquire these assets, implies that a tacit agreement was reached

- 28 -

between [the witness] and the government that allowed [the witness] to avoid any asset forfeiture liability in exchange for his cooperation." *Id.* The court rejected the government's argument that "because there was no explicit agreement [on the forfeiture issue], it had nothing to disclose": "While it is clear that an explicit agreement would have to be disclosed because of its effect on [the witness's] credibility, it is equally clear that facts which imply an agreement would also bear on [his] credibility and would have to be disclosed." *Id.* at 690.

Morgan claims the government failed to disclose Crosby's lies during his presentence interview, much like the government's nondisclosure in *Schaffer*. But Morgan discovered the claimed misrepresentations after he conducted his own investigation and does not claim (let alone demonstrate) the government was aware of the lies during the relevant time.

Evidence of misrepresentation or misleading on the part of the government is lacking and Morgan has failed to provide evidence of an agreement.[24] Instead, he merely speculates about a possible agreement based on the government's charging decisions. Speculation is not enough. "Without an agreement, no evidence was suppressed, and the

_____

[24] Morgan cites a string of Second Circuit cases wherein the prosecution deliberately withheld evidence or failed to correct perjured testimony. Neither circumstance is present in this case. *See, e.g.*, *United States v. Wallach*, 935 F.2d 445, 457 (2d Cir. 1991) (government "consciously avoided recognizing" that witness was lying and instead sought to rehabilitate him on redirect examination); *Perkins v. Le Fevre*, 691 F.2d 616, 619 (2d Cir. 1982) (prosecutor deliberately withheld rap sheet of a key witness showing he had two prior felony convictions).

state's conduct, not disclosing something it did not have, cannot be considered a *Brady* violation." *Bell*, 512 F.3d at 234 (quotations omitted).

We see no violation of *Napue*, which prohibits the presentation of known false evidence to the jury. Because Morgan has provided no evidence of any other deals, he has not demonstrated Crosby's trial testimony concerning his plea agreement and the absence of any other deals was false.

Not only that, but Morgan had the relevant facts from the government which he now uses to assign a sinister motive to the government. He could have inquired more thoroughly about these facts on cross-examination and let the jury decide the credibility issue rather than saving it for appeal.

## IV. Government's Cross-Appeal

The PSR determined Morgan's base offense level to be 14. *See* USSG §2C1.1(a)(1). Two relevant conduct points were added because the offense involved more than one bribe (Silver Oak, Dilworth, Tenaska, and three other clients) and fourteen points were added because the payments received from the six bribes totaled $684,164.52.[25] *See* USSG §§2B1.1(b)(1)(H), 2C1.1(b)(1), (2). Another four points were added under USSG §2C1.1(b)(3) because "the offense involved an elected public official or any public official in a high-level decision-making or sensitive position." The offense level was adjusted upward two levels for obstruction of justice based on Morgan's false

---

[25] The government eventually decided not to rely on the amount ($116,500) received from one of the clients, Allied Waste. But this decision did not impact the PSR's calculations.

trial testimony concerning his dealings with Silver Oak. *See* USSG §3C1.1. These enhancements and adjustments resulted in a total offense level of 36. With a criminal history category of I, the PSR calculated an advisory guideline range of 188 to 235 months imprisonment. However, the sentence was capped at the statutory maximum— 120 months.

Morgan objected to the relevant conduct determination and the upward adjustment for obstruction of justice. He also flooded the court with letters praising his character, noting his contributions to the community, and seeking leniency. He requested a sentence of probation.

The district court sustained Morgan's relevant conduct objection. Although it concluded the schemes concerning the other clients qualified as relevant conduct under USSG §1B1.3, it decided the government had failed to prove by a preponderance of the evidence that any conduct relating to Dilworth, Tenaska, or the other clients was illegal. Relying primarily on the testimony making it neither illegal nor unethical for an attorney to charge retainer fees without performing legal work, the court reasoned: "There is certainly a view you could take that would indicate that Mr. Morgan knew what he was doing was wrong and that it was wrong. There is an equally persuasive view, in my opinion, that everything he did was right and not illegal." (Government's Supp. App'x, Vol. 3 at 1233.) Thus, it concluded all sentencing guideline calculations had to be based solely on the offense of conviction (no consideration of relevant conduct). It also sustained Morgan's objection to the obstruction of justice adjustment, concluding there was "a view of Mr. Morgan's testimony that . . . it is all entirely correct and honest and

still be consistent with the other evidence and with the jury's verdict on Count 63." (*Id.* at 1235.) These rulings resulted in a total offense level of 22 and an advisory guideline range of 41 to 51 months imprisonment.

But the court went even further, varying downward and sentencing Morgan to five years of probation (no incarceration). It also ordered him to complete 104 hours of community service during the first year of probation and entered a forfeiture money judgment in the amount of $12,000 but imposed no fine. It explained its decision as follows:

> Of course, I start with the calculation of the guideline range and then go on to consider what sentence is enough but no more than necessary to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense.

> In your case, I see no need in sentencing to protect the public. This is your first introduction to the criminal justice system, and I don't think there's anything in your background that would indicate that you would have another one. I just think that is a nonfactor of this list of factors.

> Now, I think that the need to provide you with educational or vocational or medical treatment is also a nonfactor.

> So in this case, I look at the seriousness of the offense, adequate deterrence not only for you but for others, and promoting respect for the law.
> I beg[i]n with my view of the evidence. I sat through this, as did the jury, and I had definite opinions about the evidence that I don't get to voice when the jury does, but you were convicted on only one of 63 counts.

> One of the many letters submitted [o]n your behalf suggested that I figure out what your sentence should be—I suppose under the guidelines— and then divide it by 63 to come up with a fair sentence. I actually thought that was not such a bad idea, but I could not figure out the math to do it.

> But, clearly, you were charged with a lot, you were convicted with very little. And that conviction, as [defense counsel] has pointed out today,

was based on some very suspect evidence, based on the testimony of a convicted felon, resulting in a bill that no one has ever complained about.

So in this case I'm looking at the harm that was done. Certainly the harm is always to the reputation of legitimate state government. That suffers many places, sometimes in Oklahoma more than others. And that's certainly a value to be respected and for which punishment should be meted out.

I look at this book of letters. I've thought often, I don't think that I would know 482 people to even ask for a letter, much less get a positive one from all of them back. You are well loved in the community and many communities.

And so many of these people have asked for consideration of probation or other leniency [o]n your behalf.

The one thing that [the prosecutor] argues in favor a sentence of imprisonment is an important one, and that is example to others who may be inclined to try to do what you have done.

I am personally of the opinion that the publicity that has followed this case from the beginning, the results to you both in your health, your financial health, the fact that you will almost certainly lose your license to practice law, I think all of these are factors that would surely deter anyone else considering the same conduct.

For all these reasons, I am varying downward from the guideline range and imposing a sentence of probation.

(Government's Supp. App'x., Vol. 3 at 1246-48.) The government appeals from the incarceration-free sentence, charging it to be substantively unreasonable.

*A. Standard of Review*

Five years of probation imposed in the face of the 41 to 51 months of incarceration recommended by the guidelines (as calculated by the judge), the government says, is

- 33 -

substantively unreasonable when measured against the factors set out in 18 U.S.C. § 3553(a).[26] It asserts the court failed to address two of its arguments—the need for the sentence imposed to (1) provide adequate deterrence and (2) avoid unwarranted sentencing disparities. It focuses on the former as the most important factor in sentencing elected officials in public corruption cases like this one. It also points to the court's reliance on two impermissible factors—the court's doubts about the jury's guilty verdict and its conclusion that Morgan was sufficiently punished by negative publicity and other collateral consequences (the loss of his law license and deterioration of his physical and financial health). Finally, it says the court placed unreasonable reliance on the volume of supportive letters (literally hundreds).

Not surprisingly, Morgan takes a different view. He acknowledges deterrence to be a factor warranting consideration but not, as the government alleges, the most important one. He also distinguishes the cases the government relies on to show his sentence results in unwarranted sentencing disparities. According to Morgan, the court

---

[26] Section 3553(a) requires a sentencing court to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." In determining the particular sentence to be imposed, it shall consider the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence, protect the public, and provide the defendant with needed educational or vocational training, medical care or other correctional treatment in the most effective manner; pertinent guidelines; pertinent policy statements; the need to avoid unwarranted sentence disparities; and the need to provide restitution. 18 U.S.C. § 3553(a). "When a court enhances or detracts from the recommended range through application of § 3553(a) factors . . . the increase or decrease is called a variance." *United States v. McComb*, 519 F.3d 1049, 1051 n.1 (10th Cir. 2007) (quotations omitted).

properly considered the collateral consequences of his conviction and the letters of support under § 3553(a)(1)—"the nature and circumstances of the offense and the history and characteristics of the defendant." Morgan relies heavily on the deferential abuse of discretion standard of review applied to sentencing decisions, claiming no such abuse occurred here.

Since *United States v. Booker,* 543 U.S. 220 (2005), we review sentences for reasonableness—"a two-step process comprising a procedural and a substantive component." *United States v. Friedman,* 554 F.3d 1301, 1307 (10th Cir. 2009) (quotations omitted). We begin with the procedural component to determine whether there is error in the district court's calculation or explanation of the sentence. *Gall v. United States,* 552 U.S. 38, 51 (2007). Procedural error includes incorrectly calculating or failing to calculate a guidelines sentence, treating the guidelines as mandatory rather than discretionary, failing to consider the statutory sentencing factors from § 3553(a), relying on clearly erroneous facts, or failing to adequately explain the sentence. *Id.* "[A] major [variance from the guideline range] should be supported by a more significant justification than a minor one." *Id.* at 50. "Review for substantive reasonableness focuses on whether the length of the sentence is reasonable given all the circumstances of the case in light of the factors set forth in 18 U.S.C. § 3553(a)." *Friedman*, 554 F.3d 1307 (quotations omitted). Although the government couches all of its arguments as challenges to the substantive reasonableness of Morgan's sentence, some of its specific claims relate to the court considering impermissible factors and failing to address two of its arguments. Both of those arguments relate to the procedural reasonableness of the

- 35 -

sentence.  *See United States v. Lente*, 647 F.3d 1021, 1031-32 (10th Cir. 2011); *United States v. Smart*, 518 F.3d 800, 803-04 (10th Cir. 2008).  Thus, we first consider whether the court committed procedural error.

### *B. Procedural Reasonableness*

Because the government did not preserve its procedural reasonableness argument in the trial court, we review it for plain error.[27]  *United States v. Lucero*, 747 F.3d 1242, 1246 (10th Cir. 2014).  "Under this standard, we will only vacate the sentence if: (1) there is error; (2) that is plain; (3) that affects substantial rights, or in other words, affects the outcome of the proceeding; and (4) substantially affects the fairness, integrity, or public reputation of judicial proceedings."  *Id.* (quotations omitted).  This is a difficult standard to meet.  *United States v. Rosales-Miranda*, 755 F.3d 1253, 1258 (10th Cir. 2014).  But, "while difficult to overcome, [the plain error standard] serves an important

---

[27] According to the Concurrence, the government waived (rather than forfeited) any procedural reasonableness argument and thus we ought not consider it, even for plain error.  *See United States v. Teague*, 443 F.3d 1310, 1314 (10th Cir. 2006) ("[W]aiver is the intentional relinquishment or abandonment of a known right"; "a party that has *waived* a right is not entitled to appellate review.") (quotations omitted).  But, even if the government did waive the procedural reasonableness argument, we have the discretion to consider it.  *See Planned Parenthood of Kan. & Mid-Missouri v. Moser*, 747 F.3d 814, 836 (10th Cir. 2014) ("Waiver . . . binds only the party, not the court. . . . [I]t is well-settled that courts have discretion to raise and decide issues sua sponte, even for the purpose of reversing a lower-court judgment."); *see also Singleton v. Wulff*, 428 U.S. 106, 121 (1976) ("The matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases.").  "[A] federal appellate court is justified in resolving an issue not passed on below . . . where the proper resolution is beyond any doubt, or where injustice might otherwise result."  *Singleton*, 428 U.S. at 121.  This is such a case, making protracted debate about waiver unnecessary.

goal: to balance our need to encourage all trial participants to seek a fair and accurate trial the first time around against our insistence that obvious injustice be promptly redressed." *Id.* (quotations omitted). "Accordingly, we will find plain error only when an error is particularly egregious and the failure to remand for correction would produce a miscarriage of justice." *Id.* (quotations omitted). This onerous standard is satisfied here.

The jury returned a unanimous verdict finding Morgan willingly traded on his legislative status for pecuniary gain and disguised the bribery payments as legal fees. The court's sentence, at least in part, was based on its view that Morgan's conviction resulted from "very suspect evidence, based on the testimony of a convicted felon, resulting in a bill that no one has ever complained about."[28] (Government's Supp. App'x, Vol. 3 at 1247.) Morgan maintains the court may properly consider the weight of the evidence as part of the nature of the offense. The government contends these comments show the court disagreed with the verdict which led to an unreasonably lenient sentence. It is correct.

The court cannot substitute "its view of the evidence . . . for the jury's verdict." *United States v. Bertling*, 611 F.3d 477, 481 (8th Cir. 2010). "Once the jury has spoken, its verdict controls unless the evidence is insufficient or some procedural error occurred;

---

[28] We do not say the effect of the legislation should not be considered at sentencing. Surely, a more severe sentence would be appropriate if Morgan managed to pass legislation that caused specific harm to individuals. But we are concerned that the "no-harm-no-foul" approach to sentencing employed here minimizes the seriousness of this offense. Faith in honest government, the keystone of public trust, is the victim in this case.

it is both unnecessary and inappropriate for the judge to reexamine, and resolve in the defendant's favor, a factual issue that the jury has resolved in the prosecutor's favor beyond a reasonable doubt." *United States v. Rivera,* 411 F.3d 864, 866 (7th Cir. 2005); *see also United States v. Hunt,* 521 F.3d 636, 649 (6th Cir. 2008) ("[I]t would be improper for the judge in sentencing to rely on facts directly inconsistent with those found by the jury beyond a reasonable doubt."); *United States v. Curry,* 461 F.3d 452, 461 (4th Cir. 2006) ("The court erred . . . in sentencing [the defendant] based on a conclusion that contravened the jury's verdict."). A district court's "considerable discretion" to consider "the nature and circumstances" of the offense under § 3553(a)(1) "does not extend to nullifying the jury's verdict." *Bertling*, 611 F.3d at 482 (quotations omitted).

Morgan argues the jury nullification cases are not relevant here because "the District Court never said that Morgan was not guilty" and in fact denied his motion for judgment of acquittal. (Morgan's Reply and Responsive Br. at 40.) That is correct as far as it goes, but the legitimacy of the sentence unravels when the record shows the court's doubts about the verdict leaked into the sentencing decision. The court's comment that it sat through the jury trial and "had definite opinions about the evidence that [it did not] get to voice when the jury [did]," in conjunction with its comment that the evidence was

"suspect," reveal considerable doubts about the propriety of the jury's verdict.[29] (Government's Supp. App'x., Vol. 3 at 1246-47.)

Words are important. We have no doubt "a reasonable observer, hearing or reading the quoted remarks, might infer, [even if] incorrectly," that the court's estimation of the evidence, contrary to the jury's, played a role in Morgan's sentence. *United States v. Leung*, 40 F.3d 577, 586-87 (2d Cir. 1994). Its remarks differ from mere passing reference. Indeed, they appear, quite clearly, to be a significant reason for its drastic and unreasonable variance from the guideline recommendation.

Similarly, the court erred in determining Morgan was adequately punished by the heightened publicity the case received and the loss of his law license and physical and financial health as a result of his prosecution and conviction.[30] Generally, there is "no limitation . . . on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." *United States v. Pinson*, 542 F.3d 822, 836 (10th Cir. 2008) (quotations omitted). "It has been uniform and

---

[29] The court's disagreement with the verdict is not the equivalent of consideration of mitigating circumstances at sentencing. A mitigating circumstance is "[a] fact or situation *that does not bear on the question of a defendant's guilt* but that may bear on a court's possibly lessening the severity of its judgment." *Circumstance*, Black's Law Dictionary (10th ed. 2014) (emphasis added).

[30] While the court did not explicitly say Morgan had been adequately punished by these collateral consequences, it did so implicitly by claiming they were adequate deterrents. Not only was it improper for the court to consider these things as "punishment," they are not adequate deterrents, as we will explain.

constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall*, 552 U.S. at 52 (quotations omitted). On the other hand, the words of the First Circuit vibrate with thunderous resonance: "[I]t is impermissible for a court to impose a lighter sentence on white-collar defendants than on blue-collar defendants because it reasons that white-collar offenders suffer greater reputational harm or have more to lose by conviction." *United States v. Prosperi*, 686 F.3d 32, 47 (1st Cir. 2012); *see also* 28 U.S.C. § 994(d) (requiring the sentencing guidelines to be "entirely neutral as to the . . . socioeconomic status of offenders"); USSG §§5H1.2 ("[e]ducation and vocational skills are not ordinarily relevant in determining whether a departure is warranted"), 5H1.5 ("[e]mployment record is not ordinarily relevant in determining whether a departure is warranted"), 5H1.10 (socio-economic status is "not relevant in the determination of a sentence").

Take, for example, *United States v. Bistline*, where the defendant pled guilty to knowingly possessing child pornography. 665 F.3d 758, 760 (6th Cir. 2012). Bistline was sentenced to a single night's confinement in the courthouse lockup and a ten-year period of supervised release even though the advisory guideline range was 63 to 78 months imprisonment. *Id.* The judge relied in part on certain collateral consequences of his conviction, including the requirement for him to register as a sexual offender and "the publication of that registration to the community and to his friend and neighbors." *Id.* at 765 (quotations omitted). The Sixth Circuit saw it as error:

[Section] 3553(a)(2)(A) plainly states that "the *sentence* imposed" should "reflect the seriousness of the offense," (emphasis added); and none of these things are Bistline's sentence. Nor are they consequences of his sentence, as opposed to consequences of his prosecution and conviction. The district court's recitation of these collateral consequences therefore does nothing to show that Bistline's sentence reflects the seriousness of his offense. Were it otherwise, these sorts of consequences—particularly ones related to a defendant's humiliation before his community, neighbors, and friends—would tend to support shorter sentences in cases with defendants from privileged backgrounds, who might have more to lose along these lines. And "[w]e do not believe criminals with privileged backgrounds are more entitled to leniency than those who have nothing left to lose." *United States v. Stall*, 581 F.3d 276, 286 (6th Cir. 2009).

*Id.* at 765-66.

More recently, the Sixth Circuit reiterated this sentiment in a bank and wire fraud case where the district court ignored a guideline range of 57 to 71 months imprisonment to impose essentially none.[31] *See United States v. Musgrave*, 761 F.3d 602, 604 (6th Cir. 2014). In fashioning the sentence, "the district court relied heavily on the fact that Musgrave had already 'been punished extraordinarily' by four years of legal proceedings, legal fees, the likely loss of his CPA license, and felony convictions that would follow him for the rest of his life." *Id.* at 608. But the Sixth Circuit saw it for what it was, favoritism for the elite. The consequences of Musgrave's prosecution and conviction were impermissible factors to be considered: "None of these things are his sentence. Nor are they consequences of his sentence; a diminished sentence based on these considerations does not reflect the seriousness of his offense or effect just punishment." *Id.* at 608 (quotations omitted); *see also United States v. Kuhlman*, 711 F.3d 1321, 1329

---

[31] Actually, he varied downward to one day with credit for the day of processing.

(11th Cir. 2013) ("The Sentencing Guidelines authorize no special sentencing discounts on account of economic or social status.").[32]

And, as the Seventh Circuit has aptly stated:

[N]o "middle class" sentencing discounts are authorized. Business criminals are not to be treated more leniently than members of the "criminal class" just by virtue of being regularly employed or otherwise productively engaged in lawful economic activity. It is natural for judges, drawn as they (as we) are from the middle or upper-middle class, to sympathize with criminals drawn from the same class. But in this instance we must fight our nature. Criminals who have the education and training that enables people to make a decent living without resorting to crime are more rather than less culpable than their desperately poor and deprived brethren in crime.

*United States v. Stefonek*, 179 F.3d 1030, 1038 (7th Cir. 1999) (citation omitted).

We agree with the reasoning of the Sixth, Seventh, and Eleventh Circuits. By considering publicity, loss of law license, and deterioration of physical and financial health as punishment, the court impermissibly focused on the collateral consequences of Morgan's prosecution and conviction. But § 3553(a)(2)(A) requires "*the sentence imposed . . . to reflect the seriousness of his offense.*" (Emphasis added). None of these collateral consequences are properly included in Morgan's sentence. They impermissibly

---

[32] *But see United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009). In *Stewart*, the sentencing judge determined the defendant's conviction "made it 'doubtful that [he] could pursue' his career as an academic or translator, and therefore the need for further deterrence and protection of the public is lessened because the conviction itself 'already visits substantial punishment on the defendant.'" *Id.* at 141. The Second Circuit found no error: "The district court is specifically required by section 3553(a) to consider the 'just punishment for the offense.' 18 U.S.C. § 3553(a)(2)(A). It is difficult to see how a court can properly calibrate a 'just punishment' if it does not consider the collateral effects of a particular sentence." *Id.* We can't agree. Considering collateral effects is one thing, myopically dwelling upon them is quite another.

favor criminals, like Morgan, with privileged backgrounds. And, paradoxically, in this case they favor a popular politician who corruptly sold influence, not only violating the law but also betraying solemn obligations and the public's trust, and who misused his license to practice law in concealing the bribes.

As to the government's claim that the court failed to consider the need for adequate deterrence and to avoid unwarranted sentencing disparity, we disagree as to the former but agree as to the latter. While, as we will explain, its weighing of the deterrence factor amounted to substantive error, it did expressly consider it. There was no procedural error as to that. *See Lente*, 647 F.3d at 1031-32. In contrast, it did not account for the need to avoid unwarranted sentencing disparity, despite the government having raised this "material, non-frivolous" issue. *Id.* at 1035. This constitutes procedural error. *Id.*

The next question is whether the procedural errors we have identified are plain. To be plain, "[an] error must be clear or obvious" under "current, well-settled law." *United States v. Story*, 635 F.3d 1241, 1248 (10th Cir. 2011). Generally, "for an error to be contrary to well-settled law, either the Supreme Court or this court must have addressed the issue." *Id.* (quotations omitted). "However, in certain circumstances, the weight of authority from other circuits may make an error plain even absent a holding from this court or the Supreme Court." *United States v. Hill*, 749 F.3d 1250, 1258 (10th Cir. 2014) (quotations omitted). But "if neither the Tenth Circuit nor the Supreme Court has ruled on the subject, we cannot find plain error if the authority in other circuits is split." *Story*, 635 F.3d at 1248-49 (10th Cir. 2011) (quotations omitted). "This general

- 43 -

rule, however, is most persuasive where the explicit language of a statute or rule does not specifically resolve an issue." *United States v. Edgar*, 348 F.3d 867, 871 (10th Cir. 2003) (quotations omitted) (finding error to be plain where federal rule of criminal procedure specifically resolved issue).

The procedural errors in this case were plain. Admittedly, neither this Court nor the Supreme Court has addressed a case (until now) where a court varied downward in large part due to its disagreement with the jury's verdict. Yet, the weight of authority from other circuits has found these circumstances to amount to error. Moreover, even absent any precedent, it is quite clear a court's consideration of "the nature and circumstances of the offense" under § 3553(a)(1) does not permit effectively voiding the consequences necessarily attending the jury's verdict.[33]

The erroneous consideration of the collateral consequences of a prosecution and conviction as punishment was also clear and obvious. Again, neither this Court nor the Supreme Court has addressed the issue. And, while the Sixth, Seventh, and Eleventh Circuits have found consideration of consequences favoring middle- or upper-class defendants to be error, the Second Circuit has not. *See supra* n.32. Nevertheless, the

---

[33] There are circumstances under which a court may set aside a jury verdict such as a lack of sufficient evidence or a non-harmless procedural error. *See Rivera,* 411 F.3d at 866; *see also United States v. Finn*, 375 F.3d 1033, 1040 (10th Cir. 2004) (insufficient evidence); *United States v. de Hernandez*, 745 F.2d 1305, 1310 (10th Cir. 1984) (trial judge's non-harmless ex parte communication with jury). Neither applies here. Indeed, in denying Morgan's motion for judgment of acquittal, the court found the evidence was sufficient to support his conviction. To its credit, it set aside any personal doubts in favor of objective analysis. Unfortunately, that fortitude did not continue.

answer is made clear under the explicit language of 28 U.S.C. § 994(d) as well as the policy statements of the guidelines. *See* USSG §§5H1.2, 5H1.5, 5H1.10.

Finally, § 3553(a)(6) expressly requires the sentencing court to consider the need to avoid unwarranted sentencing disparities and the government argued that point. A court commits procedural error when it does not consider a "material, non-frivolous" argument raised by a party. *See Lente*, 647 F.3d at 1035.

We next consider whether the government has shown these errors affected the outcome of the proceedings (third factor). According to Morgan, even if the court had not considered the improper factors and had considered the need to avoid unwarranted sentencing disparities, the result would have been the same. Not hardly. The court's view of the evidence and its belief Morgan had been adequately punished by collateral consequences played an obvious and significant role in the sentencing decision. Had the court properly calibrated the need for the sentence to avoid unwanted sentencing disparities it would have arrived at a sentence of imprisonment. Morgan received a lenient sentence because of damage to his privileged status. But his crime was a corrupt misuse of that very status. Would a beat cop or minor government functionary ever be afforded such extraordinary consideration?

Even if the errors are plain and affected substantial rights, we have the discretion to leave them uncorrected. *Rosales-Miranda*, 755 F.3d at 1258. We may only correct plain error affecting substantial rights if we also conclude that not doing so would "seriously affect[] the fairness, integrity, or public reputation of judicial proceedings." *Id.* (quotations omitted). This standard is easily met here. More than the personalities

- 45 -

involved, this case is about public trust in the fairness and integrity of government. Also at stake is the collective reputation of all elected officials, particularly those at the pinnacle of power and prestige. What happens when that public trust is abused by corrupt acts? The offender's reputation is sullied and with it the reputation of honest and stalwart public servants. The judicial response to demonstrated corruption by the political elite and the lapse of duty, honor, and integrity it represents is as important as the corruption itself. The great orator Daniel Webster was both revered and reviled for his politics. But institutional commitment to honest government is captured in these words: "I would invoke those who fill the seats of justice, and all who minister at her altar, that they execute the wholesome and necessary severity of the law." Daniel Webster's Plymouth Oration, Plymouth, Massachusetts (Dec. 22, 1820). Lest the fairness, integrity, and public reputation of judicial proceedings suffer we must, dispassionately, meet the challenge. Harm to the public's trust in its government may be immeasurable, but that does not make it inestimable. The harm is profound by any rational estimate. Leaving intact a sentence of probation (when the guidelines recommend substantial imprisonment) based on the denigration of a jury's verdict, considering an improper factor, and failing to consider a critical factor is "particularly egregious." Our failure to correct these errors would surely be "a miscarriage of justice." *Id.*

Having found plain procedural error, we would normally remand without considering the substantive reasonableness of the sentence. *See United States v. Haggerty*, 731 F.3d 1094, 1101 n.6 (10th Cir. 2013); *United States v. Tom*, 494 F.3d

- 46 -

1277, 1282 (10th Cir. 2007). But because we easily conclude the sentence is substantively unreasonable, and in this case intolerable, we address it.[34]

*C. Substantive Reasonableness*

"Review for substantive reasonableness focuses on whether the length of the sentence is reasonable given all the circumstances of the case in light of the factors set forth in 18 U.S.C. § 3553(a)." *Friedman*, 554 F.3d 1307 (quotations omitted). Our review is for an abuse of discretion.[35] *Gall*, 552 U.S. at 51. "A district court abuses its discretion when it renders a judgment that is arbitrary, capricious, whimsical, or manifestly unreasonable." *United States v. Munoz-Nava*, 524 F.3d 1137, 1146 (10th Cir. 2008) (quotations omitted). We "must give due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance. The fact that [we] might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal of the district court." *Id.* (quotations omitted).

Nevertheless, "appellate review continues to have an important role to play and must not be regarded as a rubber stamp." *Pinson*, 542 F.3d at 836; *see also United States v. Abu Ali*, 528 F.3d 210, 266 (4th Cir. 2008) ("[I]nherent in the concept of

---

[34] We perceive one other procedural error—the court's relevant conduct decision. *See infra* n.36.

[35] In the trial court, the government did not specifically object to the sentence being substantively unreasonable. It did, however, object to Morgan's request for a sentence of probation and argued a term of imprisonment was warranted. This was sufficient to preserve its substantive unreasonableness argument for appellate review. *See United States v. Mancera-Perez*, 505 F.3d 1054, 1058-59 (10th Cir. 2007); *United States v. Torres-Duenas*, 461 F.3d 1178, 1182-83 (10th Cir. 2006).

'reasonableness' is the notion that the rare sentence may be unreasonable, and inherent in the idea of 'discretion' is the notion that it may, on infrequent occasion, be abused.") (citation omitted). "In sentencing, as in other areas, district judges at times make mistakes that are substantive. At times, they will impose sentences that are unreasonable. Circuit courts exist to correct such mistakes when they occur." *Rita v. United States*, 551 U.S. 338, 354 (2007); *see also Friedman*, 554 F.3d at 1302, 1308-12 (finding sentence of 57 months imprisonment, where advisory guideline range was 151 to 188 months, substantively unreasonable). This case cries out for appellate intervention.

Removing consideration of the improper factors (doubts about the jury's guilty verdict and consideration of the collateral consequences of a prosecution and conviction as sufficient punishment), the court's decision to vary downward to probation was based on the following: (1) seriousness of the offense, (2) the letters of support, and (3) deterrence. Properly viewed, these factors, even cumulatively, do not support the gross variance from the guidelines this sentence presents.

The court paid only lip service to the seriousness of the offense and its harm to the reputation of honest public servants and the public faith in legitimate state government. Instead, its explanation of a "fair sentence" might be one reached by first calculating the guideline sentence based on the crime of conviction (Count 63) and then dividing it by 63, the total number of counts, including the mistried and acquitted counts relating to Dilworth and Tenaska. (Government's Supp. App'x, Vol. 3 at 1247.) In doing so, it used the mistried and acquitted counts to mitigate Morgan's punishment on the count for which he was convicted. That is clearly improper. If anything, these counts should have

- 48 -

been considered as aggravating the seriousness of the offense.[36] It is improper, as well as illogical, to think acquittals on some counts somehow ameliorate guilt on convicted counts. It is worse to so treat the mistried counts. At first blush it might appear that the government concurred in the trial court's assessment as to the 28 counts against Morgan for which the jury could not reach a verdict. Close analysis reveals that first blush to be a faint one. The jury reached its verdict on March 5, 2012. The government was apparently satisfied with its partial victory and decided, for whatever reason, not to retry

---

[36] Our review of the evidence—both at trial and at sentencing—strongly suggests that the government proved by a preponderance of the evidence that Morgan's relevant conduct included, at the very least, the money he received from Dilworth and Tenaska. The evidence showed Morgan received money from these clients yet performed no legal work. As the court pointed out, it may be ethical for an attorney to charge a monthly retainer without necessarily performing any legal work that month. But there was no evidence of any legal work performed by Morgan for these clients; indeed, both clients had other attorneys performing legal work for them. And, while the jury hung on the Dilworth counts and acquitted on the Tenaska counts, those verdicts only establish the government failed to prove these counts under the more onerous beyond a reasonable doubt standard, not the preponderance standard used at sentencing. *See United States v. Magallanez*, 408 F.3d 672, 684 (10th Cir. 2005) ("An acquittal by the jury proves only that the defendant was not guilty beyond a reasonable doubt. Both before and under the Guidelines, facts relevant to sentencing have generally been found by a preponderance of the evidence."). Nevertheless, the government has not challenged the court's relevant conduct decision and therefore Morgan has not had an opportunity to address it. Thus, we decline to consider it. *Bronson v. Swenson*, 500 F.3d 1099, 1104 (10th Cir. 2007) ("[W]e routinely have declined to consider arguments that are not raised, or are inadequately presented, in an appellant's opening brief."), *but see Planned Parenthood of Kan. & Mid-Mo. v. Moser*, 747 F.3d 814, 837 (10th Cir. 2014) ("A party that waives an issue is not entitled to have us consider and rule on it. But it is well-settled that courts have discretion to raise and decide issues sua sponte, even for the purpose of reversing a lower-court judgment."). That being said, Morgan's other bribes are relevant in addressing the substantive reasonableness of his sentence, in particular the seriousness of the offense, an issue the government did raise.

those counts. It moved to dismiss them on March 10, 2012; the motion was granted five days later. Had it been able to anticipate the probation sentence imposed ten months later, on January 8, 2013, it may have made a different choice. We cannot second guess the exercise of prosecutorial discretion, and will not presume the dismissal in any way suggests Morgan's innocence or that the government lost faith in the propriety of those counts. Morgan claims the court's comments were said in jest. That may be true. But the court also pointed out separately that Morgan had been "charged with a lot [but] convicted with very little." (Government's Supp. App'x, Vol. 3 at 1247.)

The court also placed undue emphasize on the numerous letters written in support of leniency. As the government concedes, the court could and should consider the letters sent by Morgan's supporters. But a review of those letters reveals many to suffer from the same flaws inherent in the court's sentencing analysis (outlined above)—many of the authors questioned Morgan's guilt or did not know the facts surrounding the offense while others believed Morgan had been adequately punished by the collateral consequences of his prosecution and conviction. The number of letters was certainly impressive but not surprising. As the government aptly points out: "One does not become President Pro Tem without the confidence of many supporters, some quite influential." (Government's Opening Br. at 80.) The letters must be viewed in that light.

While the court did consider the need for adequate deterrence, it did so by improperly relying on the collateral consequences flowing from the prosecution and conviction. Assuming, *arguendo,* that it was proper to consider these collateral consequences as specific deterrents to further criminal behavior by Morgan (as opposed

to sufficient punishment), we fail to see how they suffice to satisfy the need for general deterrence. True, Morgan's prosecution and conviction were highly publicized in Oklahoma. But in the court's words he remained "well loved in the community and many communities." (Government's Supp. App'x, Vol. 3 at 1247.) Obviously, the publicity accompanying his trial and conviction would not necessarily deter other elected officials from similar conduct. Moreover, Morgan's health conditions (anxiety/depression and exacerbation of his pre-existing high blood pressure) seem to be temporary in nature and would not be known by other public officials. Similarly, the loss of a law license generally would not be applicable to a majority of elected officials and considering it to be a deterrent represents a loss of focus; Morgan used his law license to facilitate his criminal act. *Cf. Stefonek*, 179 F.3d at 1038 (district court erred in departing downward based on services defendant had rendered to community as a nurse because services were "provided by the very businesses that were the vehicle of [defendant's] multiple violations of federal law"). Moreover, Morgan is in the twilight of his legal career, making the loss of the privilege of practicing law in Oklahoma less devastating. As to the financial hardship Morgan incurred as a result of his trial and conviction, the record shows he lost the majority of his income between 2008, the year he left the Oklahoma Senate, and 2009. Thus, his greatest drop in income occurred when he could no longer profit from his political position and long before he began to incur legal fees.

Properly considering general deterrence, we fail to see how a non-custodial sentence would deter public officials from soliciting bribes. General deterrence comes from a probability of conviction and significant consequences. If either is eliminated or

minimized, the deterrent effect is proportionately minimized. This country depends on honest representative democracy and, while our system is imperfect, it does not generally suffer from widespread corruption. Its proper functioning requires elected officials to serve the common good, not illicit personal gain. Our citizens place faith in the honesty and integrity of elected officials. Without meaningful consequences for a breach of trust, their trust is no more than blind trust. Congress has recognized as much. Deterrence is a crucial factor in sentencing decisions for economic and public corruption crimes such as this one:

> The second purpose of sentencing is to deter others from committing the offense. This is particularly important in the area of white collar crime. Major white collar criminals often are sentenced to small fines and little or no imprisonment. Unfortunately, this creates the impression that certain offenses are punishable only by a small fine that can be written off as a cost of doing business.

S. Rep. No. 98-225, at 76 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3259.

Thus, "one of the primary objectives" of sentencing elected officials convicted of bribery is "to send a message to other [public officials] that [bribery] is a serious crime that carries with it a correspondingly serious punishment." *Kuhlman*, 711 F.3d at 1328. By awarding Morgan probation "the district court disregarded the importance of delivering such a message. In fact, [Morgan's] sentence sends the opposite message—it encourages rather than discourages [public officials] from engaging in [bribery] because they might conclude that the only penalt[y] they will face if they are caught [is probation]." *Id.* Consequences count and probation doesn't count enough in this case. And no fine was imposed. Aside from probation, Morgan's punishment comes down to

this: he was required to forfeit the $12,000 bribe, perform 104 hours of community service, and pay the standard $100 special assessment fee.

Consideration of proper factors does not admit to a probationary sentence. But more troubling perhaps are the factors not considered. The court did not mention, even in passing, the government's credible argument that Morgan should be sentenced to some term of imprisonment in order to avoid unwarranted sentencing disparities. The government cited a number of cases involving political figures accused of using their status for personal gain who were sentenced to terms of imprisonment. Morgan attempted to distinguish these cases by noting the differences in the amounts illegally gained, the attempts to conceal the scheme, and the harm caused. But he cited no case where a defendant was sentenced to probation in the absence of an acceptance of responsibility (guilty plea) or assistance to the government. Morgan did neither. Moreover, the amount of the Silver Oak bribe was relatively small in comparison to the other counts in the indictment but it looms large in terms of harm to public trust. And, as we explained earlier, Morgan attempted to cover up his bribes as legal fees, thereby both abusing his public office and violating the ethics of his profession.

The court did not seriously consider the need for the sentence imposed to promote respect for the law and to provide just punishment for the offense. While we recognize probation is a form of punishment, it is "grossly inappropriate" here:

> [I]n the past there have been many cases, particularly in instances of major white collar crime, in which probation has been granted because the offender required little or nothing in the way of institutionalized rehabilitative measures . . . and because society required no insulation from the offender, without due consideration being given to the fact that the

heightened deterrent effect of incarceration and the readily perceivable receipt of just punishment accorded by incarceration were of critical importance. The placing on probation of [a white collar criminal] may be perfectly appropriate in cases in which, under all the circumstances, only the rehabilitative needs of the offender are pertinent; such a sentence may be grossly inappropriate, however, in cases in which the circumstances mandate the sentence's carrying substantial deterrent or punitive impact.

S. Rep. No. 98-225, at 91-92 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3274-75.

Upon being elected as an Oklahoma Senator, Morgan swore to, among other things, "not, knowingly, receive, directly or indirectly, any money or other valuable thing, for the performance or nonperformance of any act or duty pertaining to my office, other than the compensation allowed by law." Okla. Const. art. 15 § 1. Not only did he violate this oath, he violated the trust of his electorate. The entire public suffers as a result and ought not be requested to tolerate a sentence amount grossly at odds with the sentencing guidelines and amounting to little more than a slap on the wrist. Condign punishment demands a significant period of incarceration. Resentencing is required in this case.

We **AFFIRM** Morgan's conviction but **REVERSE** and **REMAND** for resentencing.

**Entered by the Court:**

**Terrence L. O'Brien**
United States Circuit Judge

- 54 -

13-6025; 13-6052, *United States v. Morgan*

**HOLMES,** Circuit Judge, concurring.

I agree with the majority opinion that Michael Morgan's conviction must be affirmed and his sentence vacated. More specifically, I concur fully in all of the majority's thorough and thoughtful order and judgment, except Part IV. That is, I agree with the majority's disposition of Mr. Morgan's appeal from his judgment of conviction (Case No. 13-6025). As to that appeal, I merely write separately to express my views on one aspect of the conviction—the nature of the quid-pro-quo element required by 18 U.S.C. § 666(a)(1)(B). Regarding Part IV, though I reach the same conclusion as the majority regarding the proper outcome (i.e., Mr. Morgan's sentence must be vacated), I do so under a different rationale; I write separately to explicate it.

**I**

Turning to the conviction, I will assume knowledge of the pertinent facts in light of the majority's thorough recitation of them. I will discuss the precedent concerning the quid-pro-quo requirement of § 666 and will conclude that the relevant cases all require a quid pro quo, but of a more general sort. Finally, I will explain why the requirement was satisfied in this case.

**A**

18 U.S.C. § 666(a)(1)(B) makes it a crime if someone

> corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any

business, transaction, or series of transactions of such organization, government, or agency involving any thing of value of $5,000 or more[.]

There is some uncertainty in the law as to what type of quid pro quo, if any, is necessary to satisfy the statutory requirement that the bribe be solicited with the bribee "intending to be influenced or rewarded in connection with" official business. *Id.* As explained in detail below, the statute does demand a quid-pro-quo showing, but only in the sense of a loose exchange of payment for official action, not in the sense that the bribee must bestow a precise favor that was identified at the time of the bribe.[1]

Some authorities have observed a circuit split on the question of whether § 666 bears a quid-pro-quo requirement and on the nature of that requirement. *See United States v. McNair*, 605 F.3d 1152, 1189 (11th Cir. 2010) (suggesting that the Sixth, Seventh, and Eleventh Circuits, and to some extent the Second, require no "specific *quid pro quo*," whereas the Fourth Circuit does); Jared W. Olen, *The Devil's in the Intent: Does 18 U.S.C. § 666 Require Proof of Quid-Pro-Quo Intent?*, 42 Sw. U. L. Rev. 229, 234–40 (2012) (concluding that the Second,

---

[1] As the facts of this case illustrate, this distinction is particularly important in circumstances where an elected official receiving bribes might otherwise justify his receipt as payments for legal services or other legitimate income. *See* John T. Noonan, Jr., *Bribes* 447 (1984) ("Toqueville, describing America at the end of the 1830s, remarked that it was a nation governed by lawyers. That money paid to lawyers could be explained, or rationalized, or laundered as money paid for actual legal services was a substantial difficulty in isolating bribes paid to lawyers occupying official posts." (footnote omitted)).

Fourth, and Eighth Circuits have required a quid pro quo whereas the Sixth, Seventh, and Eleventh Circuits have not).  A closer reading of the cases, however, finds them readily reconcilable.

To begin, quid pro quo is most traditionally characterized with reference to a *specific*, one-for-one trade.  *See, e.g.*, *Black's Law Dictionary* 1443 (10th ed. 2014) (defining the term as "[a]n action or thing that is exchanged for another action or thing of more or less equal value; a substitute").  In the § 666 bribery context, though, it has been given a more general meaning that essentially just requires the government to show *any* exchange of a bribe for political action, no matter whether there is a specific connection between the bribe and the favor, such as an explicit request for that particular favor.  This position has quite clearly been taken by the circuits that are commonly understood as having imposed a quid-pro-quo requirement.  *See United States v. Redzic*, 627 F.3d 683, 692 (8th Cir. 2010) ("[T]he government must present evidence of a quid pro quo, but an illegal bribe may be paid with the intent to influence a general course of conduct.  It was not necessary for the government to link any particular payment to any particular action undertaken by [the defendant]."); *United States v. Ganim*, 510 F.3d 134, 147 (2d Cir. 2007) ("[S]o long as the jury finds that an official accepted gifts in exchange for a promise to perform official acts for the giver, it need not find that the specific act to be performed was identified at the time of

the promise, nor need it link each specific benefit to a single official act.");[2]

*United States v. Jennings*, 160 F.3d 1006, 1018 (4th Cir. 1998) ("[A] reasonable

juror could have concluded that there was a *course of conduct* involving payments

flowing from [the briber] to [the bribee] in exchange for a *pattern* of official

actions favorable to [the briber's] companies, and that was sufficient to convict

[the defendant] of bribery." (emphases added)).

Cases in the supposedly anti-quid-pro-quo camp are not inconsistent with

the aforementioned authorities, as demonstrated by the fact that those courts have

rejected a *specific* quid-pro-quo requirement, i.e., a one-for-one exchange, while

not rejecting a quid-pro-quo requirement in the sense of a more general, free-

floating exchange where an agreement is reached to exchange a bribe for official

action but where the official action is not precisely identified at the time of the

bribe.  *See McNair*, 605 F.3d at 1188 ("[T]here is no requirement in

§ 666(a)(1)(B) or (a)(2) that the government allege or prove an intent that a

*specific* payment was solicited, received, or given in exchange for a *specific*

official act termed a *quid pro quo*." (emphases added)); *United States v. Abbey*,

560 F.3d 513, 520 (6th Cir. 2009) ("By its terms, [§ 666] does not require the

---

[2]     This sentence from *Ganim* appears under the heading of "Hobbs Act
Extortion," but the Second Circuit seems to have been making a point about both
that offense and § 666, and its discussion has been understood in those terms.  *See
McNair*, 605 F.3d at 1189–90; *see also United States v. Rosen*, 716 F.3d 691, 700
(2d Cir. 2013) (applying *Ganim* to quid pro quo agreements under federal bribery
and honest services fraud statutes).

government to prove that [the bribee] contemplated a *specific* act when he received the bribe . . . ." (emphasis added)); *United States v. Gee*, 432 F.3d 713, 714 (7th Cir. 2005) ("Another argument is that the evidence does not establish any *specific* act that [the bribee] took in response to any *specific* payment . . . . Yet the statute does not require any such link." (emphases added)); *see also United States v. Terry*, 707 F.3d 607, 612 (6th Cir. 2013) (explaining, as a general principle, that "[t]he agreement between the public official and the person offering the bribe need not spell out which payments control which particular official acts. Rather, 'it is sufficient if the public official understood that he or she was expected to exercise some influence on the payor's behalf as opportunities arose.'" (quoting *Abbey*, 560 F.3d at 518)).

Even two circuits that have been regarded as mum on the question have suggested a similar approach. *See United States v. Garrido*, 713 F.3d 985, 996 (9th Cir. 2013) ("[Section] 666 does not require a jury to find a *specific quid pro quo*." (emphasis added) (citing *McNair*, 605 F.3d at 1187–89)); *United States v. Bryant*, 655 F.3d 232, 241 (3d Cir. 2011) ("[A] *quid pro quo* may come in the form of a 'stream of benefits.'").

In sum, there does not appear to be any real disagreement among the circuits regarding the *substance* of what § 666 requires, though different courts may use different terminology in describing that substance.

This approach is entirely consistent with the language of § 666. Simply

-5-

put, the statute contains nothing to imply that the favor must be specifically linked to the bribe in any way. *See McNair*, 605 F.3d at 1187–88 ("[N]othing in the plain language of § 666(a)(1)(B) nor § 666(a)(2) requires that a specific payment be solicited, received, or given in exchange for a specific official act."); *Gee*, 432 F.3d at 714–15 ("A *quid pro quo* of money for a specific legislative act is *sufficient* to violate the statute, but it is not *necessary*. It is enough if someone 'corruptly . . . accepts . . . anything of value from any person, intending to be influenced or rewarded in connection with'" government business. (quoting § 666(a)(1)(B))). Accordingly, § 666(a)(1)(B) can sustain a conviction where the evidence proves that the bribee accepted the bribe as part of an exchange for political action, even if there is no specific connection between the bribe and a particular action.[3]

## B

All that remains is to apply the test. Considering the trial testimony in the light most favorable to the government, the government established the following sequence of events. The Health Department had been citing Mr. Crosby's business for housing individuals who, according to the Department, should have been in nursing homes. Upset by the citations, Mr. Crosby turned to Mr. Morgan

---

[3] The jury instructions clearly reflected this understanding of the quid-pro-quo requirement. *See* Aplt. App. at 181 (Jury Instrs., dated Mar. 8, 2012) ("It need not be shown that any specific benefit was given in exchange for a specific official act.").

because he "needed some help. [He] didn't care whether it was a phone call, *legislation*, meetings, whatever, [he] just needed some help to get them off [his] back." Aplt. App. at 1905 (test. of Mr. Crosby) (emphasis added). Mr. Morgan then informed Mr. Crosby: "This is the way it works. You pay me a $1,000 a month retainer." *Id.* While on that retainer, S.B. 738 was introduced under Mr. Morgan's name. If enacted as drafted, the Bill would have ameliorated Mr. Crosby's problems with the Health Department by authorizing longer stays in assisted living for patients with more serious medical needs and by reducing the powers of the Health Department to regulate such matters. The version of the Bill that passed, while substantially revised and more balanced than the initial draft, did in fact help address Mr. Crosby's concerns.

To distill this narrative and recap, Mr. Crosby came to Mr. Morgan for assistance in fending off the Health Department, including legislative assistance; he paid Mr. Morgan $1,000 a month; and Mr. Morgan introduced a Bill that would have delivered such assistance, if passed as drafted, and that did in fact deliver assistance as enacted. There was an exchange of money for favorable political action and the more general quid-pro-quo test was easily satisfied. Accordingly, I have no difficulty concluding that Mr. Morgan was properly convicted under 18 U.S.C. § 666.

## II

We must proceed in considering the propriety of Mr. Morgan's sentence

from the premise that he took a bribe in violation of 18 U.S.C. § 666. At first blush, this fact might seem incongruous with the life that the record reveals Mr. Morgan has otherwise led, involving many positive contributions to the State of Oklahoma. But history and literature chronicle the lives of many otherwise good men (and women) who have allowed pride and arrogance to become the seeds of their own downfall—here, an overweening pride and arrogance that allows a man to believe that he is above the law.

What this case underscores is the consequences of failing to guard against the inherent weaknesses of the human condition. That otherwise good men are subject to these frailties is an important reason that the criminal law must supply a meaningful deterrent. Once properly charged and convicted, the law demands that *all* persons—no matter their station in life—be held to account for their actions. This is all the more so in a case involving political corruption, a serious offense which erodes the public's faith in the legitimacy of their government and its leaders. Accountability for such a serious offense calls for a significant punishment. And, as I explain below, I believe it calls for a punishment greater than the probationary sentence that Mr. Morgan received here. We need not celebrate Mr. Morgan's downfall in order to recognize that he must be held accountable for his proven misconduct. The public must have confidence that there are consequences when their leaders succumb to temptation.

After addressing a preliminary matter—that is, the scope of the

government's sentencing cross-appeal—I proceed to set forth my reasoning for rejecting the district court's sentencing order.

**A**

At the outset, I must note that I respectfully disagree with the majority regarding the scope of the government's cross-appeal: specifically, I believe that the only challenge before us involves the substantive reasonableness *vel non* of Mr. Morgan's sentence. I do not view the government as lodging a procedural-reasonableness sentencing challenge and, accordingly, would decline to review any such ostensible claim, even under the rigorous plain-error standard. In other words, I do not believe that the procedural reasonableness of Mr. Morgan's sentence is before us; this case should be resolved only with respect to substantive reasonableness.

As the majority explains, we review sentences for reasonableness under a two-step process that consists of procedural and substantive components. *See, e.g.*, *United States v. Friedman*, 554 F.3d 1301, 1307 (10th Cir. 2009) ("Reasonableness review is a two-step process comprising a procedural and a substantive component." (quoting *United States v. Verdin-Garcia*, 516 F.3d 884, 895 (10th Cir. 2008)). Where both components are at issue in a sentencing appeal, we would ordinarily begin with the procedural component and consider the substantive component only if necessary to determine whether the district court erred. *See Gall v. United States*, 552 U.S. 38, 51 (2007) ("Assuming that

the district court's sentencing decision is procedurally sound, the appellate court should then consider the substantive reasonableness of the sentence . . . ."). But the government here did not preserve a procedural-reasonableness argument in the district court or on appeal. *See United States v. Gantt*, 679 F.3d 1240, 1247 (10th Cir. 2012) ("To preserve [a procedural unreasonableness challenge] for appeal, [the] [d]efendant needed to alert the court that its explanation was inadequate, which ordinarily would require an objection after the court had rendered sentence. The court could then cure any error by offering the necessary explanation."); *United States v. Romero*, 491 F.3d 1173, 1177 (10th Cir. 2007) (holding that "the requirement of contemporaneous objection to procedural errors is consistent with our precedent and represents a reasonable burden on defendants").

The government did not object to Mr. Morgan's sentence on procedural-reasonableness grounds. Indeed, the record offers not a single clue that such a procedural-reasonableness challenge was ever made before the district court. At the sentencing hearing, after the district court explained its sentence, it advised Mr. Morgan of his right of appeal and stated, "Your period of probation begins immediately. I advise you to have a discussion with the probation office before you leave the building." Aplee. App. at 1249 (Sentencing Tr., dated Jan. 8, 2013). The district court then asked, "Is there anything else from counsel," to which the government responded, "No, Your Honor." *Id*. The district court then adjourned the sentencing proceedings, having heard no objections to the sentence.

-10-

At no point before or after this exchange did the government refer to the procedural reasonableness of the sentence.

The government therefore forfeited any procedural-reasonableness argument in the district court and, if it is entitled to review at all, it would only be for plain error. *See United States v. McGehee*, 672 F.3d 860, 873 (10th Cir. 2012) ("Unlike waived theories, we will entertain forfeited theories on appeal, but we will reverse a district court's judgment on the basis of a forfeited theory only if failing to do so would entrench a plainly erroneous result." (quoting *Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1128 (10th Cir. 2006)); *United States v. Vasquez-Alcarez*, 647 F.3d 973, 976 (10th Cir. 2011) ("If he has forfeited the stale conviction argument, we review the substantive reasonableness of his sentence only for plain error."). The government, however, has not asked for plain-error review of a procedural-reasonableness challenge. Instead, it frames the issue on appeal solely as a challenge to the substantive reasonableness of Mr. Morgan's sentence. *See* Aplee. Opening Br. at 47 ("The district court's downward variance to probation was substantively unreasonable."). Indeed, the government's briefing does not refer—even once—to procedural unreasonableness.

Because the government has not requested plain-error review of a procedural-reasonableness challenge, much less made an argument to this effect, we should not consider this forfeited error on appeal. *See, e.g.*, *Richison*, 634

-11-

F.3d at 1131 ("And the failure to do so—the failure to argue for plain error and its application on appeal—surely marks the end of the road for an argument for reversal not first presented to the district court."); *see also United States v. Lamirand*, 669 F.3d 1091, 1098 n.7 (10th Cir. 2012) ("Mr. Lamirand has not asked us to review his late-blooming argument for plain error. Accordingly, we decline to do so and will not definitively opine on the merits of this argument."). Moreover, because the government has made no procedural-reasonableness argument in its opening brief, it has waived—on this separate and independent basis—any procedural-reasonableness challenge. *See, e.g., Bronson v. Swensen*, 500 F.3d 1099, 1104 (10th Cir. 2007) ("[W]e routinely have declined to consider arguments that are not raised, or are inadequately presented, in an appellant's opening brief."); *accord United States v. Cooper*, 654 F.3d 1104, 1128 (10th Cir. 2011).

**B**

In my view, therefore, the only challenge before us on the government's cross-appeal relates to the substantive reasonableness *vel non* of Mr. Morgan's sentence. After briefly summarizing the relevant facts, I explicate my rationale for concluding that Mr. Morgan's sentence is substantively unreasonable, and that the district court erred by imposing it.

**1**

The district court calculated an advisory sentencing range of forty-one to fifty-one months pursuant to the United States Sentencing Guidelines ("U.S.S.G." or "the Guidelines"). That numerical range was derived by applying Guidelines that were specifically designed to deal with political corruption and specifically set with deterrence in mind. *See* Aplee. App. at 1267 (Presentence Investigation Report, filed Aug. 21, 2012) (calculating a base offense level of fourteen pursuant to U.S.S.G. § 2C1.1(a)(1) because Mr. Morgan was a public official); *United States v. Ruiz-Terrazas*, 477 F.3d 1196, 1200 (10th Cir. 2007) ("In setting forth the purposes and goals of the Guidelines, Congress specifically charged the Sentencing Commission with the task of formulating a structure for sentencing that would 'assure the meeting of the purposes of sentencing as set forth in [18 U.S.C. §] 3553(a)(2),'" including general deterrence. (alteration in original) (quoting 28 U.S.C. § 991(b)(1)(A))); S. Rep. No. 98-225, at 76 (1983), *as reprinted in* 1984 U.S.C.C.A.N. 3182, 3259 ("[Deterrence] is particularly important in the area of white collar crime."). From that numerical range, the court varied downward to a sentence of no imprisonment, a probationary term of five years, 104 hours of community service, and forfeiture of $12,000.

As pertinent here, the court explained its sentence as follows:

> Of course, I start with the calculation of the guideline[s] range and then go on to consider what sentence is enough but no more than necessary to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense . . . .

-13-

So in this case, I look at the seriousness of the offense, adequate deterrence not only for you but for others, and promoting respect for the law.

I began with my view of the evidence. I sat through this, as did the jury, and I had definite opinions about the evidence that I don't get to voice when the jury does, but you were convicted on only one of 63 counts.

One of the many letters submitted [o]n your behalf suggested that I figure out what your sentence should be—I suppose under the guidelines—and then divide it by 63 to come up with a fair sentence. I actually thought that was not such a bad idea, but I could not figure out the math to do it.

But, clearly, you were charged with a lot, you were convicted with very little. And that conviction, as [defense counsel] has pointed out today, was based on some very suspect evidence, based on the testimony of a convicted felon, resulting in a bill that no one has ever complained about.

So in this case I'm looking at the harm that was done. Certainly the harm is always to the reputation of legitimate state government. That suffers many places, sometimes in Oklahoma more than others. And that's certainly a value to be respected and for which punishment should be meted out.

I look at this book of letters. I've thought often, I don't think that I would know 482 people to even ask for a letter, much less get a positive one from all of them back. You are well loved in the community and many communities.

And so many of these people have asked for consideration of probation or other leniency [o]n your behalf.

The one thing that [the government] argues in favor of a sentence of imprisonment is an important one, and that is example to others who may be inclined to try to do what you have done.

I am personally of the opinion that the publicity that has

-14-

followed this case from the beginning, the results to you both in your health, your financial health, the fact that you will almost certainly lose your license to practice law, I think all of these are factors that would surely deter anyone else considering the same conduct.

For all these reasons, I am varying downward from the guideline[s] range and imposing a sentence of probation.

Aplee. App. at 1246–48 (Sentencing Tr., dated Jan. 8, 2013).

**2**

Unlike the majority, given the current state of the law regarding substantive-reasonableness review as defined by the Supreme Court and our court, I do not think that we can ever "easily conclude" that a sentence is substantively unreasonable. Maj. Op. at 47; *see, e.g.*, *United States v. Witting*, 528 F.3d 1280, 1289 (10th Cir. 2008) (Hartz, J., concurring) ("This court's present approach appears to be that a sentence is substantively reasonable if the sentencing judge provides reasons for the length of the sentence . . . . Under this court's present approach we may go through the motions of substantive-reasonableness review, but it will be an empty gesture."); *United States v. Smart*, 518 F.3d 800, 808 (10th Cir. 2008) ("We may not examine the weight a district court assigns to various § 3553(a) factors, and its ultimate assessment of the balance between them, as a legal conclusion to be reviewed de novo. Instead, we must 'give due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the

extent of the variance.'" (quoting *Gall*, 552 U.S. at 597)).[4]  However, upon

careful review of the record and the district court's rationale, I do agree with the

majority that the court's sentence is substantively unreasonable.

This case is helpfully viewed through the lens of the one precedential

decision, where we did reverse a sentence as substantively unreasonable—*United*

*States v. Friedman*, *supra*.  The district court there sentenced "a serial bank

---

[4]  Substantive-reasonableness review in the wake of the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), is a challenging endeavor, to say the least.  *See*, *e.g.*, Note, *More than a Formality: The Case for Meaningful Substantive Reasonableness Review*, 127 Harv. L. Rev. 951, 958 (2014) ("The workability of substantive reasonableness review has been the subject of withering criticism from the bench, the academy, and the Sentencing Commission itself.").  Nevertheless, substantive-reasonableness review of sentencing decisions remains an important counterweight to balance the discretion of district courts.  *See id.* at 964–70 (exploring "important functions that are diminished when courts treat it [i.e., substantive-reasonableness review] as a rubber stamp"); *id.* at 972 ("[R]esistance only reifies unwarranted disparities that the reasonableness standard was implemented to remedy.").  I endorse the remarks of one commentator who said:

> [A]ppellate courts should consider the extent of a sentence's deviation from the Guidelines (as permitted by *Gall*) and from the sentences of similarly situated offenders; assess whether the district court's reasoning is sound and whether the § 3553(a) factors emphasized by the district court can bear the weight assigned to them; and determine whether, in light of the totality of the circumstances, a sentence is shockingly high or low . . . . Courts should also recognize that remanding for resentencing is not a very costly remedy, as sentencing hearings are relatively short, discrete affairs.

*Id.* at 971.  Suffice it to say, if we are to function as more than a "rubber stamp" we must endeavor to give meaning to the substantive component of our appellate review of sentencing decisions.

robber," 554 F.3d at 1302, to a sentence of fifty-seven months in prison, "a ninety-four month variance from the bottom of the advisory Guidelines range," *id.* at 1308. On the government's appeal, we reversed the sentence as substantively unreasonable. *Id.* at 1312. At the start of our analysis, we observed that "the undeniably sparse record in th[e] case certainly bears on the question whether [the defendant's] sentence is substantively reasonable." *Id.* at 1308 n.10. We then remarked that "the district court simply disregarded the career offender provisions" that were applicable and that it "never identified how the nature of the [offense] or [the defendant's] individual characteristics supported a sentence amounting to 38% of the bottom of the advisory Guidelines range." *Id.* at 1308. It was not enough, we concluded, that the district court had a "hunch" or "feeling" that recidivism was unlikely. *Id.* at 1308 n.11. Given these gaps in the record, we could discern nothing to suggest "that the sentence imposed by the district court is reasonable in light of the factors set out in [18 U.S.C.] § 3553(a)." *Id.* at 1310.

We then turned to the specific arguments for the sentence, and rejected the defendant's contention that "the district court simply disagreed with the career offender provisions of the Guidelines." *Id.* at 1311. Although we recognized that the district court would have been entitled to express such a disagreement, it did not do so, offering only an "exceedingly limited and ambiguous statement" in defense of the variance. *Id.* At most, the district court's justification indicated

that it believed there was "something about the nature of the [offense] and [the defendant's] history and characteristics [that] called for a substantial variance from the advisory Guidelines range." *Id.* Since that determination was "unsupported by the record," it constituted "an abuse of discretion." *Id.* At the close of our discussion, we reiterated that "the very limited nature of the record and the paucity of reasoning on the part of the district court most certainly bear on our review of the substantive reasonableness of [the defendant's] sentence." *Id*. at 1312. Given those shortcomings in the record, we reversed and remanded for resentencing. *Id*.

While *Friedman* is not factually on all fours with the instant case, in my view, it supplies the appropriate analytical framework for our review. Just as in *Friedman*, we deal here with a substantive-reasonableness challenge to a significant downward variance from the Guidelines. And, just as in *Friedman*, the current record offers us no grounds to find that downward variance substantively reasonable. As a result, *Friedman* counsels that a remand for resentencing is mandated here. *Cf. United States v. Lente*, 759 F.3d 1149, 1174–75 (10th Cir. 2014) (in rejecting a substantive-reasonableness challenge, stating "[w]e also underscore the important role of the extensive record created in this case" . . . . "the type of record we expect to see when reviewing a sentence far outside the advisory Guidelines range" (citations omitted)).

I will first explain why under the circumstances of this case our

-18-

substantive-reasonableness review, while deferential, must be sensitive to the need for a justification on the record to warrant a significant downward variance. Then, I will demonstrate how that justification is absent here, thus mandating a remand for resentencing.

**3**

There are two related reasons why our review of the record for the justification for Mr. Morgan's sentence must be especially searching here: (1) the district court varied sharply from the Guidelines; and (2) the applicable Guidelines are deliberately structured to *avoid* purely probationary sentences, like Mr. Morgan's, in white-collar prosecutions.

**a**

The classic variance case is one in which a district court deviates from the Guidelines because the advisory Guidelines range fails to "fully account for the" punishment that would otherwise be appropriate under 18 U.S.C. § 3553(a). *United States v. Scott*, 529 F.3d 1290, 1304 (10th Cir. 2008). However, it is undisputed that "the Guidelines should be the starting point and the initial benchmark" of sentencing. *United States v. Ray*, 704 F.3d 1307, 1315 (10th Cir. 2013) (quoting *Gall*, 552 U.S. at 49). The substantive-reasonableness inquiry must be able to detect a reason for the variance from the Guidelines that is grounded in the factors enumerated in § 3553(a). *See United States v. Robertson*, 568 F.3d 1203, 1206 (10th Cir. 2009) ("[A] 'variance' occurs when a district

court reaches a sentence that differs from the recommended Guidelines range *through the application of the factors outlined in 18 U.S.C. § 3553(a).*" (emphasis added)); *United States v. Alapizco-Valenzuela*, 546 F.3d 1208, 1216 (10th Cir. 2008) ("[W]hen the district court varies from the advisory Guidelines range *through application of the § 3553(a) factors*, we simply consider whether the length of the sentence is substantively reasonable . . . . We . . . 'must give due deference to the district court's decision *that the § 3553(a) factors*, on a whole, justify the extent of the variance.'" (emphases added) (citations omitted) (quoting *United States v. Munoz-Nava*, 524 F.3d 1137, 1146 (10th Cir. 2008))); *United States v. Pinson*, 542 F.3d 822, 836 (10th Cir. 2008) ("*In light of the § 3553(a) factors* and recognizing the discretion vested in the district court over sentencing, we find this [variant] sentence reasonable . . . . " (emphasis added)).

Moreover, because the Guidelines play such a core role at sentencing, it stands to reason that the *size* of a variance would inform our inquiry regarding a sentence's substantive reasonableness. *See United States v. Shuck*, 713 F.3d 563, 570 (10th Cir. 2013) ("In reviewing the district court's sentence for substantive reasonableness, this court . . . will 'take into account the totality of the circumstances, including the *extent* of any variance from the Guidelines range.'" (emphasis added) (quoting *Gall*, 552 U.S. at 51)). Stated differently, the larger the discrepancy between the sentence and the advisory Guidelines range, the more of a foundation there must be in the § 3553(a) factors to justify that discrepancy.

-20-

*See Friedman*, 554 F.3d at 1308 n.10 ("[W]hen a district court varies from the advisory Guidelines range it 'must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance,' especially given that 'a major [variance] should be supported by a more significant justification than a minor one.'" (second alteration in original) (quoting *Gall*, 552 U.S. at 50)).

With these background principles in hand, it becomes clear why we must be especially discerning in our search for valid § 3553(a) factors to support the variance here. The district court varied from the Guidelines to a substantial degree, dropping from three-and-a-half years at the low end of the advisory range to zero. More to the point, the variance was a tremendous one in terms of *kind*—that is, *qualitatively*. A non-custodial punishment is qualitatively different than one that involves imprisonment. In other words, there is an obvious difference between a sentence that goes from, say, seven years of imprisonment to three-and-a-half years, and a sentence that goes from three-and-a-half years to *nothing* (i.e, no period of incarceration). *Cf. Gall*, 552 U.S. at 48 ("We recognize that custodial sentences are qualitatively more severe than probationary sentences of equivalent terms.").

In the latter situation (i.e., a downward variance to zero imprisonment), the variance deviates from the Guidelines to the fullest extent possible, and as a result our review should be as searching as the deferential standard of review allows.

-21-

*Cf. United States v. Kuhlman*, 711 F.3d 1321, 1328 (11th Cir. 2013) ("We are hard-pressed to see how a non-custodial sentence serves the goal of general deterrence [in a white-collar prosecution]."); *United States v. Pugh*, 515 F.3d 1179, 1195 (11th Cir. 2008) ("Quite simply, by imposing a non-custodial sentence, the district court accorded *no* weight to general deterrence." (emphasis added)); *Pugh*, 515 F.3d at 1199 (noting that a probationary sentence "afforded precious little if any weight" to the need to reflect the seriousness of the crime, to promote respect for the law, and to provide just punishment for the offense).

**b**

A large variance from a meaningful Guidelines prison sentence to a probationary term should trigger a close look at the record—guided by the § 3553(a) factors—under any circumstances. However, it triggers an even closer look in the context of case like this one, as the relevant Guidelines provisions were deliberately adopted to ensure that white-collar offenders, like Mr. Morgan, were treated comparably to their blue-collar counterparts, who historically have received harsher sentences.

This aspect of the Guidelines has been aptly described by Judge (now-Justice) Breyer, who was a member of the first Sentencing Commission and participated in that capacity in the creation of the first edition of the Guidelines. *See* Carissa Byrne Hessick, *Appellate Review of Sentencing Policy Decisions After Kimbrough*, 93 Marq. L. Rev. 717, 727 (2009) ("Prior to his appointment to

the Supreme Court, Justice Breyer served as one of the original U.S. Sentencing Commissioners and is often referred to as the principal author of the original Guidelines.").  In an informative law review article, then-Judge Breyer explained how the Guidelines' approach to sentencing white-collar offenders was devised:

> The Commission found in its data significant discrepancies between pre-Guideline[s] punishment of certain white-collar crimes, such as fraud, and other similar common law crimes, such as theft.  The Commission's statistics indicated that where white-collar fraud was involved, courts granted probation to offenders more frequently than in situations involving analogous common law crimes; furthermore, prison terms were less severe for white-collar criminals who did not receive probation.  To mitigate the inequities of these discrepancies, the Commission decided to require short but certain terms of confinement for many white-collar offenders, including tax, insider trading, and antitrust offenders, who previously would have likely received only probation.

Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 Hofstra L. Rev. 1, 20–21 (1988) (footnotes omitted).

In addition to equitable concerns, the Guidelines' preference for confinement of white-collar criminals is motivated by other significant interests. For one, "probationary sentences for white-collar crime raise concerns of sentencing disparities according to socio-economic class," *United States v. Levinson*, 543 F.3d 190, 201 (3d Cir. 2008); *accord United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006), and Congress has spoken out forcefully against any practice that tends to soften the sentences of the rich and powerful merely because they are rich and powerful, *see* 28 U.S.C. § 994(d) ("The Commission

-23-

shall assure that the guidelines and policy statements are entirely neutral as to the . . . socioeconomic status of offenders."). Moreover, it is especially important that white-collar sentences effectuate the general-deterrence aims of criminal punishment. *See United States v. Hayes*, 762 F.3d 1300, 1308 (11th Cir. 2014) ("[W]e have explained that general deterrence is an important factor in white-collar cases, where the motivation is greed."); *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crimes are 'more rational, cool, and calculated than sudden crimes of passion or opportunity,' these crimes are 'prime candidate[s] for general deterrence.'" (alteration in original) (quoting Stephanos Bibas, *White-Collar Plea Bargaining and Sentencing After Booker*, 47 Wm. & Mary L. Rev. 721, 724 (2005))); *accord United States v. Musgrave*, 761 F.3d 602, 609 (6th Cir. 2014); *United States v. Peppel*, 707 F.3d 627, 637 (6th Cir. 2013).

After considering this legal landscape, one of our sister circuits went so far as to say that "[o]ne of the central reasons for creating the sentencing guidelines" as a *whole* "was to ensure stiffer penalties for white-collar crimes and to eliminate disparities between white-collar sentences and sentences for other crimes." *United States v. Davis*, 537 F.3d 611, 617 (6th Cir. 2008); *accord Musgrave*, 761 F.3d at 609. I need not go so far here, as the instant case does not require me to opine about the overarching purposes of the Guidelines. Suffice it to say that there can be no doubt that, at a minimum, the Commission's desire to equalize

penalties for white-collar and blue-collar crime—by strengthening the former—is patently an important concern undergirding the *white-collar* sentencing provisions. *See, e.g.*, *United States v. Prosperi*, 686 F.3d 32, 47 (1st Cir. 2012) (discussing the importance that the Commission and Congress have placed on "the minimization of discrepancies between white- and blue-collar offenses" (quoting *Mueffelman*, 470 F.3d at 40)); *United States v. Treadwell*, 593 F.3d 990, 1012 (9th Cir. 2010) (same); *Levinson*, 543 F.3d at 201 ("The Sentencing Commission recommended terms of imprisonment for economic crimes like [the defendant's] because of its concern that sentencing for white-collar crime had been ineffectual.").

Now that the Guidelines are advisory rather than binding upon the district courts, *see Booker*, 543 U.S. at 245, "short but *certain* terms of confinement for many white-collar offenders," Breyer, *supra* at 20 (emphasis added), is no longer a goal that the Guidelines can achieve, as district courts retain the discretion to vary below the Guidelines where appropriate and a prison term is consequently no longer "certain." *See, e.g.*, *Smart*, 518 F.3d at 810 ("Applying the appropriate legal standard of review provided by *Gall* and *Kimbrough*[, 552 U.S. 85 (2007)], and crediting the district court's reasoned consideration of these multiple sentencing factors, we fail to perceive any abuse of discretion in sentencing [the defendant] to a below-Guidelines sentence."). Nevertheless, the Guidelines' policy interest in confinement for *most* white-collar offenders is an important one,

and because "the Guidelines should be the starting point and the initial benchmark" at sentencing, *Ray*, 704 F.3d at 1315 (quoting *Gall*, 552 U.S. at 49), that policy should remain a central consideration for a district court sentencing a white-collar criminal.

Indeed, the sentencing patterns of district courts, both prior to and after *Booker*, in the specific area of white-collar prosecution at issue here—political corruption—suggest that courts have demonstrated strong fidelity to the foregoing policy concerns and, consequently, have consistently declined to impose probationary sentences on corrupt government officials. More specifically, district courts have generally imposed *some* prison time in § 666 bribery cases, no matter how small the dollar amount of the bribes. *See, e.g.*, *United States v. Richard*, 775 F.3d 287, 291 (5th Cir. 2014) (affirming thirty-three month sentence for soliciting and accepting $10,000 in bribes); *see also United States v. Reid*, 764 F.3d 528, 531–32 (6th Cir. 2014) (mentioning sixty-month sentence for accepting $10,000 to $20,000 in bribes); *United States v. Owens*, 697 F.3d 657, 658 (7th Cir. 2012) (mentioning a one-year-and-one-day prison sentence for accepting $1,200 in bribes); *United States v. Curescu*, 674 F.3d 735, 737–38 (7th Cir. 2012) (mentioning a sentence of forty-one months for accepting a bribe of $1,000); *United States v. Robinson*, 663 F.3d 265, 267–68 (7th Cir. 2011) (mentioning a ten-year sentence for paying a $1,000 bribe and offering more); *United States v. Beldini*, 443 F. App'x 709, 712–13 (3d Cir. 2011) (mentioning a sentence of

thirty-six months' imprisonment for receiving two $10,000 bribes); *United States v. Anderson*, 517 F.3d 953, 958 (7th Cir. 2008) (mentioning a sentence of six years for offering a $10,000 bribe); *United States v. Gonzalez*, 193 F.3d 516, 1999 WL 706102, at *1 (5th Cir. 1999) (per curiam) (unpublished table decision) (mentioning a sentence of one year and one day for accepting $600 worth of bribes in violation of § 666(a)(1)(B)); *United States v. Agostino*, 132 F.3d 1183, 1188–89 (7th Cir. 1997) (mentioning a sentence of four months for offering a bribe of $4,000).

Tellingly, in the rare § 666 cases where district courts have imposed probationary sentences, the seemingly uniform result on appeal has been reversal of the sentence and remand for resentencing. In *United States v. Hayes*, the Eleventh Circuit vacated the probationary sentence of a defendant convicted of paying over $600,000 in bribes. 762 F.3d at 1310–11. Despite the defendant's cooperation with the government, the court concluded that the sentence was *substantively* unreasonable because it failed to provide "just punishment for [the defendant's] offense or promote respect for the law," *id.* at 1311, did not "provide the same level of deterrence as can the threat of incarceration in a federal penitentiary for a meaningful period of time," *id.* (quoting *United States v. Livesay*, 587 F.3d 1274, 1279 (11th Cir. 2009)), and was not necessary to eliminate any sentencing disparity because no such disparity existed, *id.* Further, in *United States v. Faria*, 161 F.3d 761 (2d Cir. 1998) (per curiam), the Second

Circuit vacated the defendant's sentence because the district court improperly departed downward to a probationary sentence. *Id*. at 762–63.

In the instant case, the district court did not express a disagreement with the white-collar sentencing policy of the Guidelines that favors custodial sentences for offenders—which of course it would have been free to do, *see, e.g.*, *Spears v. United States*, 555 U.S. 261, 265–66 (2009) (per curiam); *United States v. Lopez-Macias*, 661 F.3d 485, 490 (10th Cir. 2011). Accordingly, I would be hard-pressed under any circumstances to conclude that Mr. Morgan's purely probationary variant sentence is substantively reasonable. If a probationary sentence could ever be appropriate on facts such as these (and I doubt it), there would need to be an especially strong justification grounded in the § 3553(a) factors. In the next section, I will explain why it is patent that such a justification is absent here.

**4**

Having described the lens through which, in my view, we must evaluate Mr. Morgan's sentence, I can now consider its substantive reasonableness. When analyzing the substantive reasonableness of a sentence, we ask "whether the length of the sentence is reasonable given all the circumstances of the case in light of the factors set forth in 18 U.S.C. § 3553(a)." *United States v. Chavez*, 723 F.3d 1226, 1233 (10th Cir. 2013) (quoting *United States v. Reyes-Alfonso*, 653 F.3d 1137, 1145 (10th Cir. 2011)). I will examine the justifications offered

by the district court to support its sentence and will find that they cannot carry the weight assigned to them.

Beyond the pro forma references to the § 3553(a) factors, the district court made only four substantive points to justify Mr. Morgan's sentence: (1) his conviction was based on questionable evidence; (2) the legislative action that resulted from the bribe was not objectionable; (3) Mr. Morgan had already been effectively punished by means of negative publicity, financial losses, health problems, and his likely disbarment; and (4) Mr. Morgan enjoyed the support of many in the community. I address these justifications below.

**a**

The first two points are not proper considerations. Starting with the district court's criticism of the evidence, it would be extremely concerning if the district court in fact imposed a lighter sentence on Mr. Morgan because it doubted the validity of his conviction. Once a defendant has been afforded a trial, it is up to a jury of his peers to decide his guilt *vel non*. It is not for a *sentencing* court to revisit the question. *See United States v. Bertling*, 611 F.3d 477, 482 (8th Cir. 2010) ("[W]hile the district court has considerable discretion under 18 U.S.C. § 3553(a) . . . , that discretion does not extend to nullifying the jury's verdict . . . ."); *United States v. Hunt*, 521 F.3d 636, 649 (6th Cir. 2008) ("The district court appears to have relied in substantial part on its doubt that [the defendant] intended to commit fraud . . . . [I]t would be improper for the judge in

sentencing to rely on facts directly inconsistent with those found by the jury beyond a reasonable doubt."); *United States v. Rivera*, 411 F.3d 864, 866 (7th Cir. 2005) ("[I]t is both unnecessary and inappropriate for the judge to reexamine, and resolve in the defendant's favor, a factual issue that the jury has resolved in the prosecutor's favor beyond a reasonable doubt.").

Put another way, in the exercise of its constitutional duty, a jury convicted Mr. Morgan of accepting a bribe in exchange for taking legislative action. The district court was required to honor that finding, and so are we. As the majority's analysis indicates, insofar as the court weighed this improper factor in its sentencing calculus, it committed procedural error. *See United States v. Story*, 635 F.3d 1241, 1244 (10th Cir. 2011) ("A sentence is *procedurally unreasonable* if it is based on consideration of an impermissible factor." (emphasis added)); *Smart*, 518 F.3d at 803 (holding that when "a district court bases a sentence on a factor not within the categories set forth in § 3553(a)" it commits a "form of *procedural* error" (emphasis added)). However, properly before us is only a challenge to the substantive reasonableness of Mr. Morgan's sentence. And, in that context, the important point is that we should not use any purported verdict-doubt rationale as a basis for finding the district court's sentence substantively reasonable.

The same is true for the district court's second justification for the sentence: that "no one has ever complained about" S.B. 738. Aplee. App. at

-30-

1247. Bribery is not illegal because it leads to inferior legislation; it is illegal because it "betrays the public trust" and thereby undermines "the critical importance of representative self-government." *United States v. White*, 663 F.3d 1207, 1217 (11th Cir. 2011); *accord United States v. Lipscomb*, 299 F.3d 303, 309 (5th Cir. 2002) (lead opinion) (discussing "the corrupting, public-trust eroding effects of bribery" that are targeted by § 666 (quoting *United States v. Apple*, 927 F. Supp. 1119, 1124 (N.D. Ind. 1996))); *United States v. Ford*, 21 F.3d 759, 765 (7th Cir. 1994) (noting that "every act of public bribery inherently entails an abuse of public trust"). Citizens are entitled to the services of representatives who evaluate bills with an honest eye on how those bills will potentially affect the people, rather than an avaricious eye on how those bills will potentially line the representatives' own pockets. *See United States v. Rosen*, 716 F.3d 691, 694 (2d Cir. 2013) ("The corruption of elected officials undermines public confidence in our democratic institutions."). When a legislator takes official action on a bill in return for money, he irreparably and egregiously betrays this public trust, and his betrayal is no less grave when the bill actually turns out not to do any harm.[5]

---

[5] The Second Circuit made an analogous point with respect to judicial corruption in the infamous *Manton* case. In *United States v. Manton*, 107 F.2d 834 (2d Cir. 1939), the former Senior Circuit Judge of the United States Court of Appeals for the Second Circuit was convicted of conspiracy to obstruct the administration of justice and to defraud the United States. In part, the former judge challenged his conviction by arguing that the suspect decisions were legally sound. Writing for the panel, retired Supreme Court Justice George Sutherland

(continued...)

-31-

*See City of Columbia v. Omni Outdoor Adver., Inc.*, 499 U.S. 365, 378 (1991)

(noting, in dicta, that "[a] mayor is guilty of accepting a bribe even if he would

and should have taken, in the public interest, the same action for which the bribe

was paid"). The damage is done the moment the bribe is accepted—and the harm

is the most serious imaginable to our system of government.[6]

_____

[5](...continued)
explained:

> [T]he unlawfulness of the conspiracy here in question is in no
> degree dependent upon the indefensibility of the decisions which
> were rendered in consummating it. Judicial action, whether just
> or unjust, right or wrong, is not for sale; and if the rule shall ever
> be accepted that the correctness of judicial action taken for a
> price removes the stain of corruption and exonerates the judge,
> the event will mark the first step toward the abandonment of that
> imperative requisite of even-handed justice proclaimed by Chief
> Justice Marshall more than a century ago . . . .

*Id.* at 846. This principle applies with equal force to any government action taken
for unjust personal gain, regardless of whether the actor is a judge, a legislator, or
any other public official. The relative merit of the proposed action is immaterial;
the point is that government action is not for sale.

[6] In his extensive treatise on bribery, the Honorable John T. Noonan,
Jr., Senior Circuit Judge of the United States Court of Appeals for the Ninth
Circuit, explored the occurrence, understanding, and effects of bribery from
ancient times to the present-day United States. In his words,

> [i]t is beyond debate that officials of the government are relied
> upon to act for the public interest not their own enrichment.
> When they take bribes they divide their loyalty. Whether or not
> they consciously act against the public interest, they have
> adopted a second criterion of action, the proper reciprocation of
> the bribe. Their resultant conflict of interest is always a dilution
> of loyalty, always a betrayal of trust . . . .

(continued...)

**b**

That leaves only two potential reasons for the variance that at least colorably implicate the factors set forth in 18 U.S.C. §§ 3553(a)(2)(A) and (B): that Mr. Morgan had already suffered enough, such that no imprisonment was necessary; and that Mr. Morgan was beloved in his community.

The district court expressed the first point in the following terms:

> The one thing that [the government] argues in favor of a sentence of imprisonment is an important one, and that is example to others who may be inclined to try to do what you have done.
>
> I am personally of the opinion that the publicity that has followed this case from the beginning, the results to you both in your health, your financial health, the fact that you will almost certainly lose your license to practice law, I think all of these are factors that would surely deter anyone else considering the same conduct.

Aplee. App. at 1247–48. This passage could be construed as directed at the general-deterrence goals of § 3553(a)(2)(B). The problem is that there is no reasonable basis for finding the statute's general-deterrence interest satisfied.

---

[6](...continued)

> The social injury inflicted by breaches of trust goes beyond any material measurement. When government officials act to enrich themselves they act against the fabric on which they depend, for what else does government rest upon except the expectation that those chosen to act for the public welfare will serve that welfare?

Noonan, *supra*, at 704.

Consider the language of § 3553(a)(2)(B), which directs a district court to consider "the need for the *sentence* imposed . . . to afford adequate deterrence to criminal conduct." § 3553(a)(2)(B) (emphasis added). To say that negative publicity has provided adequate deterrence, as the district court did, is to essentially say that there is *no* need for the *sentence* to provide any deterrence at all: the deterrence has all come from the consequences of the investigation and prosecution, and the sentence has nothing left to add.

As the Sixth Circuit pointed out in a similar scenario, the sorts of harms recited by the district court here are not "consequences of [a defendant's] sentence, as opposed to consequences of his prosecution and conviction," and if they could justify a lighter penalty then they "would tend to support shorter sentences in cases with defendants from privileged backgrounds, who might have more to lose along these lines." *United States v. Bistline*, 665 F.3d 758, 765–66 (6th Cir. 2012); *accord Musgrave*, 761 F.3d at 608. By law, we should not countenance that result. *See* 28 U.S.C. § 994(d) ("The Commission shall assure that the guidelines and policy statements are entirely neutral as to the . . . socioeconomic status of offenders."); U.S.S.G. § 5H1.10 (noting that socioeconomic status is "not relevant in the determination of a sentence").[7]

---

[7] The majority ably makes a similar point, *see, e.g.*, Maj. Op. at 42–43, and I fully agree with its analysis, insofar as it is consistent with the discussion herein.

It is hardly surprising that a prosecution for political corruption would draw some negative attention from the media, and that it would cause financial and physical problems for a defendant. In fact, it would be surprising if such a prosecution *failed* to have some of these consequences. The Commission was surely aware of that possibility when it crafted the Guidelines, as anyone would be. It follows ineluctably that the Guidelines' strong preference for "certain terms of confinement" for white-collar offenders, Breyer, *supra*, at 20, is predicated on the notion that negative publicity and like collateral consequences are not *enough* to generate sufficient general deterrence in most bribery cases. The district court did not explain why the difficulties experienced by Mr. Morgan due to the prosecution were so *unusually* intense that imprisonment was unnecessary, and the record does not bridge that gap. *Cf. United States v. Warner*, 792 F.3d 847, 862 (7th Cir. 2015) ("While [the defendant's] prosecution has been more public than most, we agree that this fact deserves little, if any, weight."); *Musgrave*, 761 F.3d at 607 (finding a one-day prison sentence substantively unreasonable despite the district court's belief that the white-collar defendant had "'been punished extraordinarily' by four years of legal proceedings, legal fees, the likely loss of his CPA license, and felony convictions that would follow him for the rest of his life"). In my view, Mr. Morgan's probationary sentence cries out for a strong and meaningful general-deterrence justification; the district court failed to provide one.

Lastly, in relying on the extent to which Mr. Morgan is beloved in the community, the district court arguably addressed "the history and characteristics of the defendant." § 3553(a)(1). It did so in the form of the following statement:

> I look at this book of letters. I've thought often, I don't think that I would know 482 people to even ask for a letter, much less get a positive one from all of them back. You are well loved in the community and many communities.
>
> And so many of these people have asked for consideration of probation or other leniency [o]n your behalf.

Aplee. App. at 1247.

It is certainly permissible for a sentencing court to take into account letters of support for a defendant. *See, e.g.*, *United States v. Sayad*, 589 F.3d 1110, 1118–19 (10th Cir. 2009) (affirming the substantive reasonableness of a probationary sentence that was based in part on "letters from [the defendant's] community"); *Munoz-Nava*, 524 F.3d at 1149 (affirming the substantive reasonableness of a one-year-and-one-day prison sentence that was based in part on the defendant's "many letters of support").[8] That said, the letters—standing

---

[8]     It is important to be clear about the broad berth that the district court has in scrutinizing the sentencing record. The government has in this appeal questioned the district court's reliance upon the character letters urging leniency for Mr. Morgan. To be sure, we ultimately conclude that the letters are not nearly enough to uphold this sentence on substantive-reasonableness review. However, for purposes of the impending resentencing proceedings, the district court should be aware that it has the discretion to consider Mr. Morgan's letters of support as part of its sentencing calculus. *See, e.g.*, *Warner*, 792 F.3d at 857–59 (affirming the substantive reasonableness of a probationary sentence that was based in part

(continued...)

-36-

alone—cannot justify this variance when: (1) the variance is substantial in quality

<hr />

[8](...continued)
on letters detailing the defendant's charitable works and generosity); *Sayad*, 589 F.3d at 1118–19 (affirming the substantive reasonableness of a probationary sentence that was based in part on "letters from [the defendant's] community"); *Munoz-Nava*, 524 F.3d at 1149 (affirming the substantive reasonableness of a one-year-and-one-day prison sentence that was based in part on the defendant's "many letters of support").

The government's briefs could be read to suggest that a district court has less leeway in considering letters of support sent on behalf of a successful politician or other high-profile defendant than a court would have with more ordinary defendants. That is incorrect. The authority submitted by the government on this point does not limit a district court's discretion in assessing letters as part of its sentencing determination. *See Peppel*, 707 F.3d at 640–42; *United States v. Vrdolyak*, 593 F.3d 676, 682 (7th Cir. 2010); *United States v. Vigil*, 476 F. Supp. 2d 1231, 1308–09 (D.N.M. 2007), *aff'd*, 523 F.3d 1258 (10th Cir. 2008). Rather, these cases stand for three common-sense propositions regarding how district courts should approach such letters.

The first lesson is that a district court should keep in mind the type of relationship a defendant has with the authors of character letters in weighing the letters' import at sentencing, and should remember that successful figures might have, for various reasons, more supportive letters than others. *See Vigil*, 476 F. Supp. 2d at 1308–09 ("[W]hen a successful politician stands before the Court on corruption charges, he or she can usually present evidence of many good qualities and can parade before the Court others who will attest to those qualities. This ability is often the reflection of what originally brought the defendant to prominence in public life. To place too much emphasis on those qualities would run the risk of not punishing people in public life for their crimes."). Second, a district court should not place disproportionate reliance on such letters "while virtually ignoring the evidence that tugged the other way." *Vrdolyak*, 593 F.3d at 682. And, third, a district court should not impose a more lenient sentence on a financially prosperous defendant on the ground that he can contribute more economically to the community. *See Peppel*, 707 F.3d at 640–42. On remand, in my view, the district court may again consider any letters of support for Mr. Morgan, so long as it does so in the balanced fashion required by caselaw, and so long as it does so while considering the other important sentencing concerns discussed herein.

and quantity; (2) the Guidelines provisions at issue express a powerful interest in imprisonment; and (3) the only other arguably relevant discussion implicating the § 3553(a) factors—which related to general deterrence—was woefully inadequate. *Cf. United States v. Hampton*, 441 F.3d 284, 288 (4th Cir. 2006) ("In order to withstand reasonableness scrutiny, such a dramatic variance from the advisory guideline[s] range must be supported by compelling justifications related to § 3553(a) factors, and 'excessive weight' may not be given to any single factor." (citation omitted) (quoting *United States v. Green*, 436 F.3d 449, 457 (4th Cir. 2006)).

**5**

To summarize, the only comments the district court made that are even arguably addressed to the § 3553(a) factors do not give us a basis to affirm the substantive reasonableness of its sentence. The reversible error here is the imposition of a variance that cannot be justified with reference to the record and the § 3553(a) factors. The courts must be especially vigilant in encouraging obedience to political corruption laws because, as evident in the instant case, the integrity of the lawmaking process itself may be at stake. *See Hayes*, 762 F.3d at 1309 ("Bribery cannot properly be seen as a victimless crime, for in a sense it threatens the foundation of democratic government . . . . [B]ribery tears at the general belief of the citizenry that government officials will carry out their duties honestly, if not always competently."). A "just punishment" for the offense of

perverting our democratic system of government will generally be the punishment imposed upon the most serious of offenders: that is, imprisonment. *Cf. Livesay*, 587 F.3d at 1278 ("Probation [in a white-collar prosecution] does not account for the seriousness of [the defendant's] conduct. It does not punish him sufficiently . . . . It does nothing to encourage respect for the court system in this country." (quoting *United States v. McVay*, 294 F. App'x 488, 490 (11th Cir. 2008))).

All of these concerns are particularly potent in the instant circumstances. Mr. Morgan was president pro tempore of the Oklahoma Senate. He was entrusted with a weighty responsibility in the legislature, where he played an important role in shaping the laws that governed his State and its people. *See* Okla. Const. art. V, § 28 (requiring the president pro tempore to "preside over [the Senate's] deliberations in the absence or place of the Lieutenant Governor"); Kevin M. Abel, *The Constitutional Mandate that the Lieutenant Governor Presides Over the Senate*, 27 Okla. City U. L. Rev. 645, 646–48 (2002) (discussing the expansive powers enjoyed by the president pro tempore of the Senate). When a jury convicted Mr. Morgan of accepting a bribe in exchange for offering a political favor, he was guilty—in the eyes of the law—of trading his office for personal enrichment.

A democratic government cannot function when those occupying the most elevated offices act to benefit themselves rather than the citizenry for which they

work and to which they owe their highest loyalty. *See Rosen*, 716 F.3d at 694 ("The corruption of elected officials undermines public confidence in our democratic institutions."). In the absence of any explanation to the contrary—an explanation that is not in the record before us—§ 3553(a)'s factors called out for a penalty that would convey a strong message of judicial intolerance for political corruption, and that message was not sent by Mr. Morgan's probationary sentence. *Cf. Pugh*, 515 F.3d at 1195 ("Quite simply, by imposing a non-custodial sentence, the district court accorded *no* weight to general deterrence." (emphasis added)); *id.* at 1199 (noting that a probationary sentence "afforded precious little if any weight to the principles underlying 18 U.S.C. § 3553(a)(2)(A)").

In my view, it is not the charge of an appellate court to dictate the sentence that a particular defendant should receive. "We defer to the district court's weighing of the 18 U.S.C. § 3553(a) factors" when it weighs them. *United States v. Masek*, 588 F.3d 1283, 1290 (10th Cir. 2009); *cf. United States v. Lente*, 647 F.3d 1021, 1039 (10th Cir. 2011) ("Perhaps the government is right that the district court will reach the same outcome after it fills in this gap [regarding potential sentencing disparities], but . . . . [w]e cannot fulfill our appellate role, however deferential, in assessing the substantive reasonableness of the sentence without the gap having been filled."). However, when the district court never properly examines factors that may militate against the chosen sentence, and

when there is no other discernible basis for approving that sentence as reasonable, reversal and remand is our only option. If a probationary sentence for Mr. Morgan could ever survive substantive-reasonableness review—and I highly doubt it—it would require an especially detailed and persuasive application of the § 3553(a) factors to these facts. The district court's analysis does not provide anything remotely close to that. Accordingly, in my view, the sentence cannot be upheld.

### III

For the reasons stated, I respectfully concur and fully join in all of the majority's thoughtful and thorough order and judgment, except for Part IV. As to that Part, I concur in the judgment, which reverses the district court's sentencing order and remands for resentencing. I have written separately to set forth what I deem to be the appropriate rationale for reaching that sentencing conclusion.